# PAYNE *v.* HOUGHTON.

UNITED STATES MAILS; SECOND-CLASS MAIL MATTER; PERIODICAL PUBLICATIONS; DEPARTMENTAL DECISIONS AND PRACTICE; RES JUDICATA; LICENSE.

1. *Payne* v. *United States,* 20 App. D. C. 581, distinguished.
2. The general question of the extent and limitations of the judicial power to supervise the determination of the Postmaster-General respecting the admission of publications to carriage in the mails at second-class rates is not affected by differences in the form of relief sought, whether mandamus in one case or injunction in another, except that greater circumspection should be exercised where the remedy sought is injunction, which may have a continued mandatory operation.
3. Although publications which are nothing more than reprints of the whole or parts of books theretofore published, such as *Henry Esmond* by Thackeray, and Plutarch's *Alexander the Great,* etc., may comply with the conditions of §§ 10 and 14 of the act of Congress of March 3, 1879, classifying mail matter, in that they are regularly issued from a known office of publication at stated intervals, as frequently as four times a year, bear a date of issue, are numbered consecutively, and are formed of printed paper sheets, without board, cloth, leather, or other substantial binding such as distinguish printed books for preservation from periodical publications, and are originated for the dissemination of information of a useful character or devoted to literature, and have a legitimate list of subscribers, they are not periodical publications within the meaning of those sections and are not entitled to admission to

D. C.]                              Statement of the Case.

the mails as second class mail matter, but are mailable matter of the third class as defined by § 17 of that act.

4. Within the meaning of the act of Congress of March 3, 1879, classifying mail matter, the terms "periodicals" and "periodical publications" are synonymous.

5. The fact that a publisher may have made large contracts for the future delivery of his publications at prices founded on confidence in the continuation of the admission to the mails of such publications at second-class rates under a certificate issued by a former Postmaster-General will not entitle him to an injunction against the present Postmaster-General restraining the cancelation of such certificate.

6. The courts ought to and do give great weight to the long-continued practice of an executive department, founded on the interpretation of a statute conferring powers and duties of administration, but never a controlling weight save in cases of doubtful construction.

7. The head of an executive department of the government has the right to reverse a departmental practice, based upon the decision of a predecessor, even if a long continued one, and such a former decision can be said to have no elements of estoppel or *res judicata,* save in respect of a subject-matter finally settled and closed under it.

8. A certificate issued by the Post-Office Department, to a publisher, entitling certain of his publications to admission to the mails as second-class mail matter, and which by its own terms continues in effect until revoked, is a mere license.

No. 1303.    Submitted May 19, 1903.    Decided June 5, 1903.

HEARING on an appeal by the Postmaster-General from a decree of the Supreme Court of the District of Columbia in a suit in equity to enjoin him from refusing to admit the complainant's publications to the mails as second-class mail matter, granting the injunction prayed for.                              *Reversed.*

The COURT in the opinion stated the case as follows:

This is an appeal from a decree of the Supreme Court of the District, declaring that the complainants, Henry O. Houghton, Trustee, George H. Mifflin, J. Murray Kay, Lucy H. Valentine, Henry O. Houghton, Oscar R. Houghton, and Albert F. Houghton, under the partnership name of Houghton, Mifflin & Company, are entitled to have their publications, entitled "Riverside Literature Series," received and transmitted through the mails

as matter of the second class, and perpetually restraining the defendant, the Postmaster-General, from enforcing and continuing the cancelation of the certificate of entry formerly issued to complainants, and from refusing to receive and transmit the said publication through the mails as mailable matter of the second class.

The cause was submitted upon bill, answer, and exhibits, and the final decree from which this appeal has been prosecuted was entered March 10, 1903.

The bill alleges: That complainants, under the partnership name of Houghton, Mifflin & Company, were, on March 17, 1886, and have ever since been, engaged in the business of printers and publishers of books and periodicals of the Riverside Press in Cambridge, Massachusetts, having their office of publication at 4 Park Row, Boston, which said office was and is well known. That since said date they have been publishing a series of periodical publications known and described as "Riverside Literature Series," each of which has been regularly issued at stated intervals, as frequently as four times a year, has borne date of issue, has been numbered consecutively, and has been issued from the known office of publication aforesaid. That each and every one of these publications has been formed of printed paper sheets, without board, cloth, leather, or other substantial binding such as distinguish printed books for preservation from periodical publications. That each and every one has been devoted to literature, has had a legitimate list of subscribers, and has not been designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates, and in respect of publication and issue has complied with all the requirements of the laws relating to mailable matter of the second class.

That of these publications already issued, Nos. 1–18 were issued weekly to July, 1886; Nos. 19–42, monthly to April, 1889; Nos. 43–62, quarterly to April, 1894; Nos. 63–116, semi-monthly to May, 1897; Nos. 117–143, monthly to May, 1900; Nos. 144–151, quarterly to April, 1902. That from March 17, 1886, to the date of filing this bill these publications have been recognized, entered, and admitted by the successive Postmasters-Gen-

eral of the United States as mailable matter of the second class, and have been conveyed at the rates for such matter prescribed under certificates to that effect, the last of which bears date September 15, 1900. (The certificate is attached and is of the regular form of certificate adopted by the Postoffice Department for second-class mail privileges, concluding with these words: "Valid while the character of the publication remains unchanged, or until revoked.") That on April 4, 1902, complainants were served with notice to show cause why their publications aforesaid should not be denied second-class rates of postage, on the ground that they have the characteristics of books, upon a hearing set for April 22.

That evidence and argument were submitted at the hearing given on the date aforesaid on behalf of the continuation of the said mailing privilege; that on May 5 complainants were served with notice in writing to the effect that the certificate of admission before mentioned had been canceled, and that thereafter it would be unlawful to print the usual statement of entry as second-class matter, and, further, that their publications when offered for mailing thereafter would have to be prepaid at third-class rates; that subsequently the order of cancelation and denial of second-class privilege was stayed until May 31; that this cancelation and refusal are unlawful, and the exclusion of the aforesaid publications will cause complainants great pecuniary loss and damage both in the advanced rates demanded and in the necessary reorganization of their business for the distribution of the same, which, during the past year, amounted to about 500,-000 copies.

That complainants are liable, under existing contracts, to supply upward of 2,000,000 copies of these publications at a price based upon the postage rates chargeable upon them as matter of the second-class. That the action of the Postmaster-General in excluding their publications is a reversal of an unbroken practice of 16 years, and is the destruction of a property right exceeding $5,000 in value. And that complainants are without adequate remedy at law, because if any remedy could be afforded at law it would necessitate a multiplicity of suits.

The answer of the Postmaster-General, reserving exceptions to the authority of the court to review the exercise of discretion by him in the matter of investigating and determining the character of the complainant's publications and the rates of · postage chargeable thereon, admits the formal allegations of the bill, but. denies that the said "Riverside Literature Series" is a periodical publication within the meaning of the law, and avers that the several numbers of the same have all the characteristics of, and are, books, and as such are not mailable at second-class rates. The answer then proceeds to describe the character of the publication as follows:

"That said publications have not the characteristics of said second class of mail matter in that they have no true relation or connection one with another so as to constitute them a periodical within the intent of the law, but each publication, issue, or so-called number is in truth a separate reprint, unaltered and unabridged, of what previously has been published confessedly as a book or as a part of a book; and defendant further avers that. the complainants have been in the practice, whenever the reprint was of greater volume than usual, of calling such a publication a double, triple, quadruple, or quintuple number, as the magnitude of the publication might require, and of charging therefor twice, thrice, four, or five times the usual price, as the case might be.

"And the defendant further avers that the said several reprints follow one another quarterly, without order or system, in such manner as to form a wholly disconnected and varied succession of distinct pieces of reading matter in biography, poetry, essays, literary and descriptive, natural history, and mythology; and that the only connection between the successive reprints consists in the mere fact that over the title of the publication or particular reprint are printed the words 'Riverside Literature Series,' and that the said reprints are numbered successively;, and the defendant further avers that the complainants have been in the practice of printing, under the said style of the 'Riverside Literature Series,' so-called extra numbers, designated not by numbers, but by letters of the alphabet, which said extra num-

bers are of the same kind and nature and in all respects similar to the periodically published numbers or issues which are numbered successively; all of which will appear by an examination of the copies of such publications filed with the said bill and with this answer as a part hereof (marked Exhibits A, B, C, D, E, and F), as well as by an inspection of the titles of the different numbers as the same are printed upon the cover of each of said copies.

"And in further denial of the allegation that said several reprints published under the style of the 'Riverside Literature Series' constitute a periodical publication within the meaning of the act of March 3, 1879, the defendant says that the said reprints are sold by the complainants as separate publications complete in themselves, and are designed and used as text-books for the study of literature, and the same are likewise sold at a reduced rate for 10 or more copies of the same publication, and also at a further reduced rate for 100 or more copies of the same publication, and the same publications bound in linen covers, without other or further change, are confessedly sold as books; all of which facts will more at large appear by reference to the printed announcement, catalogue, or advertisement of said series issued by the complainants and annexed to this answer, marked Exhibits G and H, and prayed to be read as a part hereof."

The answer further avers that the revocation of the certificate of admission to the mails was based, not upon any regulation of the Department, but on the sole ground that the publication aforesaid was not admissible to the mails as matter of the second class, because it was not such as defined in the statute making classification of mail matter.

Among the exhibits are the following numbers of the "Riverside Literature Series": First. A complete republication of *Henry Esmond,* with thick paper cover and linen back. Above the title, with name of author and publishers, appear the words "Riverside Literature Series" in large letters. Near the top of the cover appears the following: "Issued monthly. September to June, No. 140 (Quintuple Number). February 7, 1900." Near the bottom appears list of prices: "Single numbers, 15

cents; double numbers, 30 cents; triple numbers, 45 cents. quadruple numbers, 50 cents; quintuple numbers, 60 cents." Second. *Three Outdoor Papers,* by T. W. Higginson, No. 141. Third. *Sesame and Lilies,* by John Ruskin, No. 142. Fourth. *Plutarch's Alexander the Great,* done into English by Sir Thomas North, No. 143. Fifth. *The Books of Legends,* by Horace E. Scudder, No. 144. All of these, save in title, date, and number, bear the same imprint as *Henry Esmond.* Other exhibits consist of catalogues of the publishing company, giving titles, prices, etc. Prefatory notes in these announce the purpose of the publishers "to issue in inexpensive form for school use the most interesting and instructive masterpieces of the greatest writers of England and America," and also inform the public that while each number has been issued in paper covers, many single numbers and many combinations of numbers have been bound in linen covers in response to a demand for a larger amount of material in a single volume with a more permanent binding. The price list gives the cost of the paper numbers and also the bound volumes. Bound volumes sent at purchaser's cost; paper backs are postpaid. Many other publications of this series and by other publishers were, by consent of parties, exhibited on the hearing.

The sections of the postal laws which have bearing, direct or indirect, upon the subject-matter of the controversy are the following:

"Sec. 7.    That mailable matter shall be divided into four classes:

"First.    Written matter.

"Second.    Periodical publications.

"Third.    Miscellaneous printed matter.

"Fourth.    Merchandise."

"Sec. 10.    That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals, and as frequently as four times a year, and are within the conditions named in sections 12 and 14."

"Sec. 12.    That matter of the second class may be examined

at the office of mailing, and if found to contain matter which is subject to a higher rate of postage such matter shall be charged with postage at the rate to which the inclosed matter is subject;

"*Provided,* That nothing herein contained shall be so construed as to prohibit the insertion in periodicals of advertisements attached permanently to the same."

"Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

"First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue and be numbered consecutively.

"Second. It must be issued from a known office of publication.

"Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguished printed books for preservation from periodical publications.

"Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers: *Provided, however,* That nothing herein contained shall be so construed as to admit to the second-class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

"Sec. 15. That foreign newspapers and other periodicals of the same general character as those admitted to the second class in the United States may, under the direction of the Postmaster-General, on application of the publishers thereof or their agents, be transmitted through the mails at the same rates as if published in the United States.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

"Sec. 17. That mail matter of the third class shall embrace books, transient newspapers and periodicals, circulars, and other matter wholly in print (not included in section 12), proof sheets, corrected proof sheets, and manuscript copy accompanying the same, and postage shall be paid at the rate of 1 cent for each 2

ounces or fractional part thereof and shall fully be prepaid by postage stamps affixed to said matter.

"Printed matter other than books received in the mails from foreign countries under the provisions of postal treaties or conventions shall be free of customs duty, and books which are admitted to the international mails exchanged under the provisions of the Universal Postal Union Convention may, when subject to customs duty, be delivered to addresses in the United States under such regulations for the collection of duties as may be agreed upon by the Secretary of the Treasury and the Postmaster-General."

Section 20 puts in the fourth class all matter not embraced in the first, second, and third classes, with certain limitations upon its character, weight, etc.

"Sec. 25. That publications of the second class, one copy to each actual subscriber residing in the county where the same are printed, in whole or in part, and published, shall go free through the mails; but the same shall not be delivered at letter-carrier offices, or distributed by carriers, unless postage is paid thereon at the rate prescribed in section thirteen [6] of this act: *Provided,* That the rate of postage on newspapers, excepting weeklies, and periodicals not exceeding two ounces in weight, when the same are deposited in a letter-carrier office for delivery by its carriers, shall be uniform at 1 cent each."

*Mr. John G. Johnson* and *Mr. Henry H. Glassie,* Special Assistants to the Attorney-General, for the appellant.

*Mr. Holmes Conrad* and *Mr. William S. Hall,* for the appellees:

1. The doctrine of *res adjudicata* is not confined to the final judgments of courts, but extends to those of every tribunal, whether boards, commissioners, or departments, charged with the power and duty of hearing and determining matters submitted for their decision. *Johnson* v. *Tousley,* 13 Wall. 72; *Belcher* v. *Linn,* 24 How. 508; *Brown* v. *Jackson,* 7 Wheat. 218;

*Sanford* v. *Sanford,* 139 U. S. 642. And if the Postmaster-General acted in a judicial rather than in a ministerial capacity in determining on May 5, 1902, that these publications did not fall within second-class matter, entitled to pound-rate privileges, then he must have acted in like capacity on September 15, 1900, when he decided that they were in the second-class privileges, and it was not competent for him, any more than it would be for a court, to reverse and annul his previous final judgment. If he is *judicial* for one purpose he is judicial for *all* in the same matter.

2. Where Congress has defined and prescribed the characteristics of second-class matter, it is not competent for the Postmaster-General, by his rules and regulations, to repeal, modify in any respect or to any extent the effect of the act of Congress. Act of Congress of March 3, 1879, chap. 180, §§ 10, 12, and 14; Act of Congress of March 3, 1885 (23 St., 385). Congress not having empowered the Postmaster-General to act *judicially* as to this classification of mail matter, and the matter to be ascertained in this case having been already ascertained and acted upon by the Department for many years, the duties and powers of the Postmaster-General in 1902 were plainly ministerial, and not judicial; and it is difficult to understand how, when the conditions remained as they had been for many years, he could reverse the conclusion so long settled. See *Teal* v. *Felton,* 12 How. 291, 292.

3. A long-established, uniform construction by an executive department should not be disregarded where persons have contracted with the government upon the faith of such construction. *United States* v. *Graham,* 110 U. S. 219. From the 17th of March, 1886, to 5th of May, 1902, a period of sixteen years, the complainants here sent these publications through the mails, after first obtaining a certificate from the Post-office Department that it had been "determined by the Third Assistant Postmaster General to be a publication entitled to admission into the mails at the pound rate of postage, and entry of it as such is accordingly made upon the books of this office." On the faith of this determination they had made contracts with their subscribers through-

out the United States, on terms which were calculated and fixed on the "pound rate of postage." They had, during this period, largely increased the volume of their publications; had extended the field of their operations and multiplied their contracts, and to that extent had greatly enlarged their obligations. These are yet in binding force and operation, and must be met and fulfilled by them. The question is thus presented here: Has the present Postmaster-General the lawful power and right, by a different and novel construction of the act, to deprive complainants of the *right,* so acquired, and entail upon them the vast pecuniary loss, which must be consequent upon this capricious change of the law. See *United States* v. *Alabama R. R. Co.* 142 U. S. 621; *Teal* v. *Felton,* 12 How. 139. The contract is of the simplest character. The United States say in effect to every citizen: If and when the prescribed rate of postage is paid we will carry and deliver your mail matter for you. The United States thus assumed a contractual obligation, for the breach of which they are answerable in damages, or from the wilful, threatened breach of which they may be restrained by injunction. *Interprise Asstn.* v. *Zumstein,* 37 U. S. Appeals, 71; *Moore* v. *Robins,* 96 U. S. 530, 535; *Noble* v. *Union River Logging Railroad,* 147 U. S. 170; *United States* v. *Stone,* 2 Wallace, 535. The courts will never intervene in cases that are pending in the Departments, awaiting the exercise of their administrative functions, but where those functions have been fully and finally exercised, and rights have been adjudged, then are those Departments *functus officio* as to such cases, and further remedy must be sought in the courts of equity. *Johnson* v. *Towsley,* 13 Wallace, 86.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The case at bar is distinguishable from that of *Payne* v. *United States ex rel. National Railway Publishing Co.* 20 App. D. C. 581, inasmuch as there is not only some difference in the facts relating to the respective publications, but also, and particularly, for the reason that the action of the Postmaster-General in that case was based upon a regulation

of his Department, in excess of his authority, because it made a substantial addition to the requirements of the statute.

Upon the practical admission, as apprehended by the court in that case, that the plaintiff had complied with the requirements of the statute itself, and had been denied the admission of its publication to the mails as matter of the second class, by virtue of the unauthorized regulation, it was held that the Postmaster-General owed it the performance of a simple duty plainly imposed by the act of Congress that was enforceable through the writ of mandamus.

The same question touching the judicial power to supervise the determination of the head of the Postoffice Department respecting the admission of publications to carriage in the mails at second-class rates has been raised and argued in the case at bar in application to the facts disclosed by the record.

And the general question of the extent and limitations of this power is not affected by differences in the form of relief sought, whether mandamus in one case or injunction in another. The difference of the operation of the two remedies in a particular case, as illustrated in *Payne* v. *Bates & G. Co. post,* p. 250, would seem, however, to suggest the exercise of greater circumspection where the remedy sought is injunction, which may have a continuing mandatory operation.

With these suggestions we will pass the question, and consider the case upon its merits, which have been fully and ably argued upon both sides, believing that on account of litigation, both pending and imminent, the public and private interests will be better served by so doing.

2. It appears that the publications of the "Riverside Literature Series" comply with the conditions of § 14 of the statute in that they are regularly issued from a known office of publication, at stated intervals, as frequently as four times a year, bear a date of issue, are numbered consecutively, and are formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications. For the present purpose it may be assumed that they are all originated for the dissemination of infor-

mation of a useful character or devoted to literature and have a legitimate list of subscribers. The question then arises: Are these publications—*Henry Esmond, Plutarch's Life of Alexander,* and others—books, and therefore mailable matter of the third class as defined in § 17; or, as a result of their issue in consecutive numbers and parts of the "Riverside Literature Series," do they constitute a periodical publication, and become mailable matter of the second class, as defined in §§ 10 and 14?

We think that there is but one reasonable answer to this question, and that has been given by the Postmaster-General.

*Henry Esmond,* when given to the world by the genius of Thackeray in 1852, and whether issued by the publisher in paper covers or with board, cloth, leather, or other substantial binding, was a book in every sense of the word. Republished singly at any time since the enactment of the present postal law, and mailed, either bound or unbound, it has been, and is now, unquestionably subject to postage as matter of the third class.

Does it become any the less a book when, there being no protecting copyright, it may be republished verbatim under its original title, with the addition of a number of a named series consisting of books by other authors, numbered consecutively, and issued at stated periods not less than four times a year?

Can the well-known book lose its identity and become completely merged in a periodical publication through the adoption and imprint of these additions?

Surely Congress could have contemplated no such possibility when it undertook the complete classification of mail matter, putting books in one class and periodical publications in another.

It is a matter of common knowledge that when these statutes were enacted there were in existence many long-established periodical publications, known generally as magazines and reviews, that had been regularly issued in consecutive numbers at stated periods not less than four times a year from well-known offices of publication. These, while purchased and sold by book and newsdealers, were in great part sent through the mails to individual subscribers throughout the country.

Conceiving that such of these as disseminated information of

a public character or were devoted to literature, the sciences, arts, or some special industry, and had legitimate lists of subscribers, were of educational value and promotive of the public good, Congress undertook to encourage their circulation along with the ordinary newspapers of more frequent issue by admitting them to carriage in the mails at an exceptionally low rate. Each of these had a single general name; consecutive numbers, alike in size, print, etc., were but parts of one continuous publication, having no sub-title or other specific designation to distinguish them from each other. A publication of the kind is commonly called a periodical, and answers the definition of that word as given in the Century Dictionary:

"A publication issued at regular intervals in successive numbers or parts, each of which (properly) contains matter on a variety of topics and no one of which is contemplated as forming a book by itself."

In view of the general character of the periodical publications of the time, and the collocation of descriptive words in § 10— "all newspapers and other periodical publications"—we think it reasonable to believe that the framers of the law regarded periodical publications and periodicals as synonymous.

This inference seems reduced to certainty by the language of succeeding sections of the same statute. In § 15 we find that "foreign newspapers and other periodicals of the same general character as those admitted to the second class in the United States" shall be transmitted at the same rates as if published therein.

If, then, the contention on behalf of the appellees be correct, an English publisher might republish all of Thackeray's novels under the adopted title of some literature series, in consecutive numbers, issued at least four times a year, and not only transmit them to subscribers through the mails of the United States as second-class mail matter, but also, it seems, secure their entry free of customs duty by the concluding provision of § 17. Again, whilst by § 10 the regular newspaper and periodical publications are made matter of the second class, § 17 embraces "transient newspapers and periodicals" in the third class. Finally, in §

25, which gives free carriage within the home county to publica-
tions of the second class, the proviso relating to postage when de-
livery shall be made by carrier uses the word "periodicals" alone.

The periodicals or periodical publications above mentioned
may well be described as "originated and published for the dis-
semination of useful information or devoted to literature, the
sciences, arts, or some special industry." On the other hand, the
several numbers of the "Riverside Literature Series" that have
been named—each a complete independent work—are, as de-
scribed in the publisher's catalogue, "masterpieces of the great-
est writers of England and America." They constitute litera-
ture and are not accurately defined as "devoted to literature."

It is to be observed also that the provisions of § 14 are not de-
scriptive of the periodical publications named in § 10, but ex-
press limitations upon the admission of such publications to car-
riage as second-class matter under the head of conditions to which
they must conform before the privilege can be enjoyed. One does
not look to them to determine what is a periodical publication,
but to ascertain whether, being such a publication as is embraced
by § 10, it also answers the conditions imposed. Viewed in this
light, there is no substantial weight in the argument based on the
concluding words of the third condition that relates to binding,
namely, "such as distinguish printed books for preservation from
periodical publications." These words are to some extent con-
fusing, but it would do violence to approved rules of construc-
tion to give them the effect of controlling the meaning of peri-
odical publications when the same shall have complied with other
formal conditions. The words are apparently superfluous, and
if used with any purpose it would rather seem to be to emphasize
the limitation to unbound periodicals.

Another feature that distinguishes the "Riverside Literature
Series" from the ordinary periodical is that it has no "back num-
bers" that may become practically valueless and dead matter, so
to speak, in so far as the mailing privilege is concerned. No. 1,
first issued in 1886, is as much alive as, and possibly more than,
the latest number of 1902 or 1903. It is Longfellow's *Evange-
line,* and the catalogue of 1902 announces "a new and enlarged

edition, with introduction, notes, and illustrations—the only authorized school edition," and offers it in paper covers or bound in cloth.

After sixteen years it continues to be mailed as matter of the second class to subscribers when in paper covers bearing the number, and as matter of the third class to purchasers when more substantially bound. Any inquiry into what may be meant by the condition requiring a legitimate list of subscribers is precluded by the allegation of the bill to that effect, which has not been denied.

Whether such requirement is answered by lists of dealers who order from time to time exclusively for sale, and that embrace none of the single subscribers, common with the ordinary periodicals, is, however, a question which the Postmaster-General may be called upon to decide when admissions to the mail are demanded.

3. The fact that appellees may have made large contracts for the future delivery of their publications, at prices founded on confidence in the continuation of the certificate of admission to the mails at second-class rates, that was issued under a former administration of the Postoffice Department, does not entitle them to the injunction granted under what we regard as an incorrect interpretation of the law. The courts ought to, and do, give great weight to the long-continued practice of an executive department, founded on the interpretation of a statute conferring powers and duties of administration, but never a controlling weight save in cases of doubtful construction. In view of the importance of general stability, the succeeding heads of a department may well give greater weight than the courts to the decisions of their predecessors, but they have a right to reverse a practice, even long continued, when clearly convinced that it is founded on an incorrect interpretation of the law. Save in respect of a subject-matter finally closed and settled under the former practice, the decision on which that practice is founded contains no element of estoppel or *res judicata,* as the doctrines thereof are applicable in judicial proceedings. Were an attempt made now to reopen the question as to mail matter carried

under the former permission, and collect additional postage, the question would be a very different one.

In conclusion, it may be remarked that the certificate relied on is a mere license, and by its own express declaration continues · until revoked.

In accordance with these conclusions, we must reverse the decree appealed from, with costs, and remand the cause to the court below with direction to dismiss the bill. It is so ordered.

*Reversed.*

Affirmed by the Supreme Court of the United States, 194 U. S. 88.

