**PENNSYLVANIA WATER & POWER CO.
v. FEDERAL POWER COMMISSION.**

No. 7599.

United States Court of Appeals for the
District of Columbia.

Argued June 9, 1941.

Decided Oct. 20, 1941.

Charles Markell, of Baltimore, Md. (Walter C. Clephane and Arthur H. Clephane, both of Washington, D. C., and George T. Hambright, of Lancaster, Pa., on the brief), for petitioner.

Wallace H. Walker, Asst. Gen. Counsel, Federal Power Commission, Richard J. Connor, and David W. Robinson, Jr., all of Washington, D. C. (William S. Youngman, Jr., Gen. Counsel, Federal Power Commission, and Gregory Hankin, Sp. Counsel, Federal Power Commission, both of Washington, D. C., on the brief), for respondent.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

GRONER, C. J.

This is a petition[1] to review an order of the Federal Power Commission requiring petitioner to apply for a license to operate and maintain its hydroelectric project in the Susquehanna River near Holtwood, Pennsylvania.[2]

---

[1] Federal Power Act, 16 U.S.C.A. § 825*l*:

"(b) Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the Circuit Court of Appeals of the United States for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. * * * The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. * * * "

[2] The Holtwood Dam is approximately

In September, 1938, the Commission issued an order reciting that petitioner was operating and maintaining a hydroelectric project, commonly called the Holtwood Development, across and in the Susquehanna River at McCall's Ferry near Holtwood, Pennsylvania, and that the river is a navigable water of the United States from and above the plant reservoir (in Pennsylvania) to its mouth in Chesapeake Bay. The order directed the petitioner to show cause why appropriate proceedings should not be instituted against it for failure to obtain a license pursuant to the Federal Power Act. Petitioner filed an answer admitting the maintenance of the development without permit or other authority from the United States, but denying that the Susquehanna is a navigable water of the United States and. challenging the jurisdiction of the Commission to institute the proceedings. The Commission ordered a hearing before an examiner, briefs were filed by the parties, and in November, 1939, the Commission made its findings of fact and conclusions of law, and issued an order requiring petitioner to apply for a license pursuant to the Federal Power Act. Petitioner thereafter moved for a rehearing and stay. The Commission granted the stay but denied rehearing.

In the argument in this court petitioner insists:

1. That the Susquehanna at and near the dam is not a navigable waterway of the United States within the Federal Power Act;[3]

2. That the operation and maintenance of the dam is legal, and that the Commission is not authorized by the Act to stop its maintenance and operation or to require petitioner to apply for a license;[4] and

3. That the order of the Commission is unlawful, arbitrary, and unsupported by substantial evidence.

First. From the above it is clear that the first and, as we think, the main question for decision is whether the Susquehanna River at and near the point of the dam is a navigable water of the United States. The answer would have been more difficult prior to the recent decision of the Supreme Court in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, for in my opinion the effect of that decision is very greatly to enlarge the previously considered view of federal jurisdiction over the waterways of the Nation. Accordingly, what is decided in this case must be in the light of what is said there. Before the decision in the Appalachian case, the generally accepted definition of "navigable waters of the United States" was that given in The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999: " * * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, *in their ordinary condition*, as highways of commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form *in their ordinary condition* by themselves, or by uniting with other waters, a continued highway over

---

26 miles above the mouth of the Susquehanna River and was constructed under the Pennsylvania Mill Dam Act of 1803, 4 Smith's Laws, Ch. 2342, Purdon's Pennsylvania Statutes Annotated, Title 55, Chapter 10, Sections 291–293. It is the largest hydroelectric plant in the State of Pennsylvania. Petitioner is the riparian proprietor on both banks of the river at the place of construction and has operated the project since 1910. The plant supplies power to Baltimore and Lancaster.

3 Section 23:

"It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam * * * in any of the navigable waters of the United States * * * except under and in accordance with the terms of a permit or valid existing right-of-way granted pri-

or to June 10, 1920, or a license granted pursuant to this chapter." 16 U.S.C.A. § 817.

4 Section 4:

"The commission is hereby authorized and empowered—
 * * *

"(g) Upon its own motion to order an investigation of any occupancy of, or evidenced intention to occupy, for the purpose of developing electric power, public lands, reservations, or streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States by any person, corporation, State, or municipality and to issue such order as it may find appropriate, expedient, and in the public interest to conserve and utilize the navigation and water-power resources of the region." 16 U.S.C.A. § 797(g).

which commerce is or may be carried on with other States or foreign countries *in the customary modes in which such commerce is conducted by water."* [Italics supplied.]

In a recent case[5] we said of this definition that, although there had been much writing on the subject, the principle had consistently been adhered to by the Supreme Court, except that in Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914, it had been narrowed by a holding that the term commerce should be construed to mean commerce of a substantial and permanent character. And we cited in support of the statement, The Montello, 20 Wall. 430, 22 L.Ed. 391; Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S. Ct. 409, 65 L.Ed. 847; Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771; United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465. And to these should be added, United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844; Brewer-Elliott Co. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L. Ed. 140, and United States v. Cress, 243 U. S. 316, 37 S.Ct. 380, 61 L.Ed. 746.

In the Appalachian case, Judge Chesnut, who wrote the opinion of the Circuit Court of Appeals,[6] likewise reached the conclusion that the rule established in The Daniel Ball had consistently been sustained. That court accordingly held that a river is a navigable water of the United States only when in its natural and ordinary condition it is used or capable of being used in interstate commerce and navigation of a substantial character. And in relation to the extent of the powers of Congress over the navigable waters, the court concluded on the authority of a long line of Supreme Court cases, that federal legislation with respect to a navigable water is permissible only when it has some real and substantial relation to control for purposes of navigation. For instance, said the court, Congress has no authority to construct a hydro-electric dam primarily and only for the development and sale of water power.

■■ Undoubtedly, the criteria adopted by the Court of Appeals were those which had been established by the Supreme Court —as to navigability, in The Daniel Ball, supra, three quarters of a century ago and followed in numerous cases down to United States v. Oregon, supra, in 1935; and, as to the permissible extent of federal control over navigable waters, by the decisions in Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 63, 41 S.Ct. 237, 65 L.Ed. 500, United States v. River Rouge Co., 269 U.S. 411, 419, 46 S.Ct. 144, 70 L.Ed. 339, and Wisconsin v. Illinois, 278 U.S. 367, 415, 49 S. Ct. 163, 73 L.Ed. 426. But in the Appalachian case the Supreme Court distinguished the former cases and rejected the doctrine that navigability in fact must exist under natural and ordinary conditions and the other doctrine that the constitutional power of the United States over the waterways of the Nation is limited to control for purposes of navigation, that is to say, for the protection and improvement of the waterways for the operation of vessels in interstate and foreign commerce. Instead, the Court now holds, first, that when, by improvements with reasonable regard to cost and need, a river may be made available for navigation in interstate commerce, it is a navigable waterway of the United States even though such improvements have neither been made nor authorized—it is enough that they may be made; and, second, that the power of the United States over the waterway exists equally in the case of flood protection, watershed development, and—more far-reaching—the recovery of the cost of improvements through the utilization of power structures for the purpose of generating electricity. All of these things are denominated commerce, and the constitutional right to regulate commerce is no longer limited, as it was, to control and improvement of the waterway for the operation of vessels in interstate and foreign commerce.[6a]

■ This brings us, then, to our first question: Is the Susquehanna at Holtwood a navigable river of the United States?

5 Miami Beach Jockey Club v. Dern, 65 App.D.C. 369, 83 F.2d 715.

6 4 Cir., 107 F.2d 769.

6a In the Seattle case the Supreme Court said [255 U.S. 56, 41 S.Ct. 239, 65 L.Ed. 500]: "The right of the United States in the navigable waters within the several states is limited to the control thereof for purposes of navigation". This language was repeated in the River Rouge case, and in Wisconsin v. Illinois, 278 U.S. 367, 415, 49 S.Ct. 163, 170, 73 L.Ed. 426, the Court said that Congress "may not arbitrarily destroy or impair the rights of riparian owners by legislation which has no real or substantial relation to the control of navigation or appropriateness to that end".

The answer, while dependent upon the peculiar facts applicable to that river, must be made with due regard to the general principles newly established in the Appalachian case and in the application of those principles to the facts in that case. In this view, it may not be amiss to compare the history and physical characteristics of the New River[7] and the Susquehanna. The former was discovered in 1671 by Colonel Abram Woods, and there is a record of several exploratory trips on parts of it made in 1742, 1812, 1817, 1819, and 1828. There were also some early abortive Acts of Virginia relating to the proposed opening or improvement of the river for navigation. In 1872 Congress authorized a survey of the river, and in 1876 and running through 1882 Congress made various appropriations for work on different parts of the river. Approximately $112,000 was expended under these appropriations, with the result that the Chief of Engineers of the War Department subsequently summarized the situation of the navigability of the river as a whole as being unchanged and the improvements insufficient to make it a through highway for commerce.

The New rises in northwest North Carolina near the Virginia line and runs for approximately 250 miles through Virginia and West Virginia, where it unites with the Gauley to form the Kanawha, which in turn flows into the Ohio.

"Among mountain streams it seems to be unique in the peculiar geologic formation of its rocky bed due to folds and faults in the rock strata, producing ledges running across the stream in many places. In a thirty-five mile stretch of the river in Giles County, Virginia * * * the geologic environment is 'markedly unusual' in that it has been the scene of four predominant breaks or faults; and the slope or gradient of the rocks in the river bed is very unusual in that the incline 'is downward in an upstream direction rather than in a downstream direction', with the result that the water falls over the ledges almost vertically. Some of the ledges are upthrust above the surface of the water, and some are barely submerged, and this relative condition varies naturally with the depth of the water in alternate wet and dry periods. The difficulties and dangers of navigation caused thereby, both downstream and upstream, are obvious."[8]

The earliest recorded use of the river for any form of transportation occurred during the Civil War when supplies were occasionally taken down the river in bateaux to a Confederate commissary depot some miles above the Virginia-West Virginia line. There was some evidence that the river had been used by keel boats between Radford, Virginia, and Hinton, West Virginia, in the latter part of the eighteen hundreds, but the District Judge who heard the case found that such trips were irregular, were attended with difficulty, and formed no appreciable part of any commercial transportation on the river. For the last 25 years there has been no appreciable intrastate or interstate navigation of the river at or near the proposed dam site, though there is evidence of such use of other parts of the river near and over the West Virginia line. The opinion of the Supreme Court describes the physical characteristics of the "crucial stretch of the river" in this language: "In the report of the Secretary of War for 1872 appears Hutton's useful mile-by-mile survey of the river from above Allisonia [Virginia] to the mouth of the Greenbrier, which is nearly down to Hinton [West Virginia]. It was made as a basis for plans to improve the New by federal appropriation. This survey designates the Radford-Wiley's Falls stretch as 'mile 46' to 'mile 104' inclusive. Eighteen of these miles have grades falling, gradually or abruptly, more than four feet in the mile. Several of these where there are rapids or falls show drops of eight, nine and in one instance $11\frac{1}{2}$ feet. The higher footage represents, of course, miles in which small falls are found. Between these more precipitous sections are many miles of what is called 'good water,' with a gradual fall of 4 feet or less. Even in miles where the declivity is rapid, the fall is apparently largely in sections containing obstructions. For instance, the 51st mile reads 'Rapid, over bowlders and gravel, 1,500 feet long; fall, $8\frac{1}{2}$ feet,' and the 100th mile 'Neilley's Falls and rapids; whole fall, 11 feet, 6 of it nearly vertical. A sluice 500 feet long, along left bank, will pass them, with 50 feet of rock excavation and 450 feet of bowlders and gravel.' Quite frequently where the fall is moderate, other obstructions appear, as

[7] The river involved in the Appalachian case.

[8] Opinion of Judge Chesnut in United States v. Appalachian Electric Power Co., 4 Cir., 107 F.2d 769, 781.

the 78th mile 'Rapids, 500 feet long, over bowlders and gravel; fall, 2 feet.'" (pages 412, 413 of 311 U.S., page 301 of 61 S.Ct. 85 L.Ed. 243)

The average of flow at Radford (near the point in dispute) over a period of 28 years ending September 30, 1935, was 3,211 cubic feet per second, and the low water depth in the channel where there is a channel, varies from a few inches to more than six feet.

In the Appalachian case the two lower courts held the New River to be nonnavigable, but the Supreme Court held otherwise, since, as the Supreme Court found, the New was shown to be navigable in part and susceptible of being made a continuous navigable waterway for interstate commerce, even though the expenditure of large sums of money would be required.

The Susquehanna is one of the very large rivers of the country, exceeding in length any other on the eastern seaboard. It was discovered by Captain John Smith, whose courage and resourcefulness saved the Jamestown Colony from abandonment and destruction, and thus preserved the North American Continent to Anglo-Saxon colonization. Of his memorable voyage up Chesapeake Bay in 1608, he relates that, after the discovery of the "Pawtuxunt" (Patuxent), he found that: "Thirtie leagues Northward is a river not inhabited, yet navigable; for the red clay resembling *bole Armoniack* we called it *Bolus*. At the end of the Bay where it is 6 or 7 myles in breadth, it divides itselfe into 4. branches, the best commeth Northwest from among the mountaines, but through Canows may goe a dayes iourney or two up it, we could not get two myles up it with our boat for rocks. Upon it is seated the Sasquesahanocks, neare it North and by West runneth a creeke a myle and a halfe: at the head whereof the Eble left us on shore, where we found many trees cut with hatchets. The next tyde keeping the shore to seeke for some Salvages; (for within thirtie leagues sayling, we saw not any, being a barren Country,) we went up another small river like a creeke 6 or 7 myle. From thence returning we met 7 Canowes of the Massowomeks, with whom we had conference by signes, for we understood one another scarce a word: the next

day we discovered the small river & people of Tockwhegh trending Eastward."[9]

The river was later surveyed in the fall, winter, and spring of 1615–1616 by Brulé, a Frenchman in the employ of Champlain. It has its source in Lake Otsego in the central part of New York and flows in a general southerly direction approximately 400 miles through New York, Pennsylvania, and Maryland, where it empties into Chesapeake Bay at the city of Havre de Grace. Beginning in 1785, individuals, private corporations, and public authorities in Pennsylvania and Maryland spent effort and money in an attempt to make the lower reaches of the river navigable. In that year Pennsylvania declared it to be a public highway in all parts thereof within that state, and in 1799 made an appropriation for opening navigation down to the Maryland line. In 1783, c. 23, Maryland passed an Act to make the Susquehanna navigable from the Maryland-Pennsylvania line to tidewater and incorporating the "Proprietors of the Susquehanna Canal". In 1795, c. 63, an Act was passed authorizing a lottery to raise not exceeding $50,000 to be applied "towards the opening the navigation of the bed of the said river", and in 1797, c. 99, Maryland declared the river from the Maryland line to tidewater a public highway free for any person or persons whatever to work thereon in clearing the obstruction to its navigation. Shortly thereafter work was done which apparently resulted in the safe use of rafts, arks, and keel boats; and for some time a considerable traffic, said to have reached millions annually in value, was carried down the river, some of it to tidewater. Congress early recognized the importance of the river, and in 1789 a resolution was adopted by the House fixing the permanent seat of government at some convenient place on its banks in the State of Pennsylvania.

From time to time over the last 50 years surveys of the river with relation to its navigability have been made by the engineer corps of the Army, resulting in reports that the steep slope and rocky bed of the river render impracticable an adequate improvement by open channel means and that to make the river navigable for commerce would necessitate the expenditure of millions of dollars. However, during recent

[9] Smith, John.
The generall historie of Virginia, New-England, and the Summer Isles with the names of the adventurers, planters, and governours from their first beginning Anᵒ: 1584, to this present 1624 * * * London, Printed by I. D. and I. H. for Michael Sparkes, 1624, p. 24.

years private power dams, creating sizeable pools, have been erected in the lower Susquehanna at Conowingo, Holtwood, Safe Harbor, and York Haven. Above Havre de Grace the river is now navigable for about 5 miles for vessels drawing 15 feet, but between that point and Harrisburg in Pennsylvania navigation is limited to isolated regions.

The Commission found that a channel 6 to 9 feet deep could be provided from the Chesapeake Bay to petitioner's dam at Holtwood by excavating for a short distance at the seven-mile point (about two miles below the Conowingo dam) and for a quarter of a mile at the 23.5-mile point (a mile below petitioner's dam). Above petitioner's dam the Commission found that the clear water in the pool extends for over 7 miles, decreasing in depth from 84 feet to 5 feet. If locks were constructed in the Holtwood and Conowingo dams, the Commission declared, navigation could be conducted from the Holtwood pool down to and beyond the State of Maryland. Whether this is too optimistic a picture, we need not stop to inquire. Enough appears from which to conclude that the Susquehanna, like the New, at different periods in the past has been used by vessels in interstate commerce of a kind, and that the former, like the latter, is susceptible in the future of being made navigable in interstate commerce if Congress should decide to appropriate the necessary money and to authorize the work to be done. And the showing of need is certainly no greater in the case of the New than in the case of the Susquehanna. Otherwise, the differences existing are all in favor of the Susquehanna. The average fall of that river is slightly more than 4 feet per mile and nowhere exceeds 7.8 feet, as against an average of 7.1 and a maximum of 31 feet for the New. The average annual flow at Holtwood is about 35,000 cubic feet per second, as against a much smaller flow in the New. Furthermore, the past navigation of the New was limited to rather isolated instances and to small craft. The Susquehanna, on the other hand, with the aid of canals along its banks, bore a considerable interstate commerce for a long period of years. Both rivers are today navigable in certain unrelated sections. Neither, for a long time past, has carried any interstate commerce in navigation, and it may well be that in the case of the Susquehanna, as was declared by the Supreme Court to be true in the case of the New, there is no present need of improvements with the object of making the river usable for interstate navigation. But this question is no longer controlling. Instead, the navigable waters are subject to national planning and control in the regulation of commerce, and this includes the power to regulate, and I would assume, the power also to construct a dam for the generation of electricity. Viewed in this aspect, far-reaching as it is, and as contrary as I think to the principles recently thought to be fixed and binding, we have no hesitation in declaring the Susquehanna a navigable water of the United States within the provisions of the Federal Power Act.

■ Second. Petitioner, however, contends that even if the Susquehanna is found to be a navigable waterway of the United States, its dam is nevertheless a lawful structure, since it was—as petitioner insists—placed in the river with the consent (prior or subsequent) of Congress. But we think this position is not maintainable. The contention is based on the fact that in 1904 Secretary of War Taft was called on to approve or disapprove the location and plans of a railway bridge desired to be constructed over the Susquehanna at Havre de Grace by the Pennsylvania Railroad. His decision turned on the question whether, under the provisions of Section 9 of the Rivers and Harbors Act of 1899,[10] the consent of Congress was necessary, and his answer upon (1) whether the river was a navigable water of the United States, and (2) if navigable in part, whether the navigable portion or portions lay wholly within the limits of a single state. The Secretary found that interstate navigation on the river was impracticable, and therefore held that it was navigable only in one state and accordingly

[10] "It shall not be lawful to construct or commence the construction of any * * * dam * * * in any * * * navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: Provided, That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced. * * *" 33 U.S.C.A. § 401.

that under the statute the approval of the Chief of Engineers and the Secretary of War was sufficient. Petitioner's position is that, since it built its dam relying on the decision of Secretary Taft and maintained it until recently without objection by Congress or the federal authorities, there was an implied consent to the erection and maintenance of the structure and the United States is estopped from now insisting that the dam is an unlawful obstruction in a navigable stream. But clearly this does not follow, for several reasons: (1) Even if we assume the conclusiveness of Secretary Taft's finding, petitioner can derive no advantage from it, because under existing law[11] the construction of its dam was legal only if it had submitted its plans to the War Department and received the approval of the Secretary and Chief of Engineers, and there is no claim that this ever was done; and (2) the contention that the finding is binding beyond the particular project in which it was made is incorrect, and this follows from the fact that the supervision and control by Congress of the navigable waterways "is continuing in its nature" and no part of this power and supervision "will be presumed to have been surrendered unless it was manifestly so intended". Newport & C. Bridge Co. v. United States, 105 U.S. 470, 480, 26 L. Ed. 1143. Obviously there was no manifest intention to bind the United States as to petitioner's project by anything that occurred in relation to the Pennsylvania Railway bridge. Union Bridge Co. v. United States, 204 U.S. 364, 400, 27 S.Ct. 367, 51 L.Ed. 523, makes this perfectly clear, for there it is said that neither the silence nor inaction of Congress, when individuals or corporations under the authority of a state place unreasonable obstructions in the waterways, can have the effect to cast upon the government an obligation not to exert its constitutional power to abate the obstruction. And in Louisville Bridge Co. v. United States, 242 U.S. 409, 417, 37 S.Ct. 158, 61 L.Ed. 395, the Court said that even an Act of Congress granting without reservation a right to construct a bridge over a navigable waterway of the United States was not binding on future Congresses and that in the interests of commerce and navigation the grantee could be required to change or remove the obstruction. The decision of Secretary Taft was made in the light of the then established rule that the navigable waters of the United States were confined to those used or susceptible of being used in their ordinary condition as highways of commerce by water,[12] and based on that rule the decision was clearly right. But this conception of the character of the public waters, as now appears, was too narrow, and the Supreme Court having announced a new rule under which, as we are required to hold, the Susquehanna is a navigable stream, it would be wholly inadmissible to say that the mistaken view of the Secretary created a vested right which Congress is without power to disturb

"In view of the importance of general stability, the succeeding heads of a department may well give greater weight than the courts to the decisions of their predecessors, but they have a right to reverse a practice, even long continued, when clearly convinced that it is founded on an incorrect interpretation of the law. Save in respect of a subject-matter finally closed and settled under the former practice, the decision on which that practice is founded contains no element of estoppel or *res judicata,* as the doctrines thereof are applicable in judicial proceedings."[13]

As already indicated, it is at least doubtful whether an Act of Congress specifically applying to petitioner's project would have been binding against the action of subsequent Congresses. But that question aside, certainly there is no authority to sustain the view that Secretary Taft's action in the Pennsylvania bridge case may be seized upon to help petitioner in its present dilemma. Conclusive of this is the decision in Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939. There the Secretary of War established lines of navigability in the harbor of Norfolk. A lumber company, as riparian proprietor, had extended out a wharf in front of its upland prior to the establishment of government lines. Thereafter, it improved and extended its wharf to the new lines, as it had an unquestioned right to do. Subsequently the Secretary "in the interests of commerce and navigation" changed the lines, as the result of which a part of the wharf extended into the new channel-way. The wharf owner claimed that the required demolition of the wharf to conform to the new lines was a

---

[11] Section 9, Rivers and Harbors Act, supra.

[12] The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999.

[13] Payne v. Houghton, 22 App.D.C. 234, 249, affirmed 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888.

taking under the Fifth Amendment, but the Supreme Court denied the right to damages on the ground that the original establishment of the lines was at most a license or consent to extend improvements to that point and was revocable at the pleasure of the government without compensation.

■ We are, therefore, forced to the conclusion that the action of Secretary Taft with relation to the railway bridge, even if relied upon by petitioner in the erection of its dam, affected in no sense the power of Congress to require its abatement or its continued maintenance on such conditions only as it should impose.

■ Nor do we think there is any greater force in petitioner's argument that Sections 4(g) and 23 of the Federal Power Act are prospective and not retroactive; in other words, that the Power Act does not apply to dams constructed before its passage. To sustain petitioner's position in this respect would be to disregard the plain language of the Act. Section 23 makes it unlawful "to construct, operate, or maintain * * *." a dam in a navigable water of the United States without a license. Petitioner is maintaining its dam contrary to this provision. It cannot be considered, we think, that Congress meant to allow existing obstructions to continue unregulated in the navigable streams of the United States. The contrary policy is definitely shown in the passage in 1899 of the Rivers and Harbors Act, which prohibits all obstructions in navigable waters except with government approval. Petitioner's dam is an obstruction, and even if it be conceded it fits "in as a part of the river development", that fact will not prevent the exercise by the United States of its paramount authority.[14] Section 4(g) authorizes the Power Commission to investigate any occupancy of bodies of water over which Congress has jurisdiction. The dam is an occupancy of the Susquehanna River, and the Section in such circumstances authorizes the Commission to issue such orders as it may find appropriate. In this instance, the order issued is that petitioner apply for a statutory permit, and that order, as we think, petitioner must obey. In view of what has been said, it is clear the Commission's order was not arbitrary.

Affirmed.

EDGERTON, Associate Justice.

We need not decide how far the doctrine of the Appalachian case is new, and on that point I express no opinion. On all other points, I concur in the opinion of the court.

The Commission's finding of navigability seems to me right not only under the reasonable-improvement rule but for two independent reasons as well. (1) Beyond question there was, at various times in the past, unbroken commercial navigation of the river by boats of a sort. "Commercial disuse * * * does not amount to an abandonment of a navigable river or prohibit future exertion of federal control. Economy Light & Power Co. v. United States, 256 U.S. 113, 118, 124, 41 S.Ct. 409, 65 L.Ed. 847."[1] "When once found to be navigable, a waterway remains so."[2] (2) Beyond question the river is now capable of navigation, in broken stretches, by boats of a sort. "Navigability, in the sense of the law, is not destroyed bcause the watercourse is interrupted by occasional natural obstructions or portages."[3] "There has never been doubt that the navigability referred to in the cases was navigability despite the obstruction of falls, rapids, sand bars, carries or shifting currents."[4] Congress, in the definition of "navigable waters" in the Federal Power Act, has expressly recognized this principle.[5]

[14] Appalachian case, bottom of page 426 of 311 U.S., page 308 of 61 S.Ct., 85 L.Ed. 243.

[1] Arizona v. California, 283 U.S. 423, 453, 454, 51 S.Ct. 522, 525, 75 L.Ed. 1154.

[2] United States v. Appalachian Power Co., 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243.

[3] Economy Light & Power Co. v. United States, 256 U.S. 113, 122, 41 S.Ct. 409, 412, 65 L.Ed. 847.

[4] United States v. Appalachian Electric Power Co., 311 U.S. 377, 408, 409, 61 S. Ct. 291, 300, 85 L.Ed. 243.

[5] 49 Stat. 838, 16 U.S.C.A. § 796 (8).