[No. 753. January 5, 1898.]

UNITED STATES OF AMERICA, Appellant, v. THE RIO GRANDE DAM & IRRIGATION COMPANY et al., Appellees.

NAVIGABLE STREAMS—OBSTRUCTION—ACTS OF CONGRESS, SEPTEMBER 19, 1890, AND JULY 13, 1892, CONSTRUED.—Held: That the waters of the Rio Grande are not navigable in New Mexico, and can not be said to be navigable waters in respect to which the United States has jurisdiction within the meaning of the acts of congress of September 19, 1890, section 10, and July 13, 1892, section 3, prohibiting the erection of any dam or other structure in the navigable waters of the United States, without permission of the secretary of war; and the construction of a dam across that stream within New Mexico for irrigation purposes, is not in violation of these acts, nor of any law of the United States, nor of any treaty.

*Appeal*, from a decree for defendants dismissing the bill, from the Third Judicial District Court. Affirmed, all concurring; Hamilton and Laughlin, JJ., in the result.

The facts are stated in the opinion of the court.

W. B. CHILDERS, United States attorney, for the United States.

"Natural falls or other obstructions do not destroy the navigable character of a river above them, if it be navigable." Spooner v. McConnell, 1 McLean, 337; 7 Meyers' Fed. Dec., sec. 3152; Escanaba Co. v. Chicago, 107 U. S. 678; "The Montello," 20 Wall. 430.

It is not necessary that a stream should in fact be navigated to constitute it a navigable stream.   "The Montello," 20 Wall. 430 et seq.; Spokane Mills Co. v. Post, 50 Fed. Rep. 429; Shaw v. Oswego Iron Co., 10 Ore. 371; Escanaba Co. v. Chicago, supra; Miller v. Mayor, 109 U. S. 385.

Nor is it necessary that a stream should be capable of such use at all times, to render it navigable.   Brown v. Chadbourne, 31 Me. 4; Treat v. Lord, 42 Id. 150; Veazie v. Dwinnel, 50 Id. 484; Lancy v. Clifford, 54 Id. 489; Thunder Bay Co. v. Speechy, 31 Mich. 336; 18 Am. Rep. 184.

Any obstruction to the navigable capacity of any waters in respect of which the United States has jurisdiction, is prohibited by act of congress, and the continuance of any such obstruction made a penal offense unless by permission of the secretary of war.   Act September 19, 1890; 26 Stat. Law, 426; Act July 13, 1892, 27 Stat. 110.

A river may be wholly within a state, and yet be a navigable water of the United States.   Escanaba Co. v. Chicago, 107 U. S. 678, and "The Montello," 20 Wall. 430, supra.

The mere settlement upon public lands gives no rights as against the government.   Frisbie v. Whitney, 9 Wall. 187; The Yosemite Case, 15 Id. 77; Shepley v. Cowan, 91 U. S. 330.

The common law as to water rights is in force in New Mexico.   Walker v. Railroad Co., 165 U. S. 593.

W. A. HAWKINS, S. B. NEWCOMB and A. B. FALL for appellees.

As to the matter of judicial notice, see: U. S. v. Lawton, 5 How. 25; 12 Am. and Eng. Ency. of Law, 151; Brown v. Piper, 91 U. S. 41; Conger v. Weaver, 6 Cal. 557.

As to what constitutes a navigable stream, see: "The Daniel Ball" Case, 10 Wall. 557; "The Montello" Case, 20 Id. 431. See, also, Rep. on Irrigation (U. S. Dept. Agri.), 1893; 11 Ann. Rep. Geol. Sur., part 2, maps; Id., p. 54.

As to the question of where authority over the navigable waters of the United States (over which congress has not directly assumed control) is lodged, see: Pound v. Turk, 95 U. S. 463; also, Wilson v. Blackbird C. M. Co., 2 Pet. (U. S.) 250.

Not only the right of appropriation of navigable waters, but the right to the local control by the states and territories of such waters, has been repeatedly recognized by congress and confirmed by the courts. Rev. Stat. U. S., sec. 2339; Supp. Rev. Stat., p. 946, Mar. 3, 1891; Act Feb. 26, 1897; Atchison v. Peterson, 20 Wall. 508; Basey v. Gallegher, Id. 670.

As to the construction of section 10 of the Act of 1890, see: U. S. v. Hall, 63 Fed. Rep. 473; U. S. v. Marthinson, 58 Id. 765.

The application of the Rio Grande Dam & Irrigation Company for government sites vests in it a right to such sites for use as reservoirs. 91 U. S. Rep. 338.

It will not be presumed that congress intended by a later act to take away the rights so given, unless the intention to do so is clear and explicit. Frost v. Wenie, 157 U. S. 58; State v. Sturgess, 10 Ore. 58; Endlich on Interpt. Stat. 298-303.

SMITH, C. J.—This is a suit in equity brought by the United States to restrain the Rio Grande Dam & Irrigation Company from constructing or maintaining a dam across the

Rio Grande river, in the territory of New Mexico. The
structure especially aimed at is a dam projected and about to
be built by the defendant company at a point called "Elephant
Butte," the object of which is to take water from the river,
and store it in reservoirs, for the purpose of irrigation. The
ground upon which the claim of the government is predicated
is that the Rio Grande is a navigable river, and that the pro-
posed dam will obstruct the navigation of the river, the flow
of waters therein, and interfere with its navigable capacity;
and that such obstructions would be contrary to the treaty with
Mexico, and in violation of the acts of congress. A prelim-
inary injunction was granted, and defendant ordered to show
cause why it should not be continued. The defendant an-
swered, denying that the Rio Grande is a navigable river, and
also filed pleas justifying under its right of way for canals and
reservoirs secured under the act of congress of 1891 and cer-
tain territorial laws. Upon the hearing the court below held
that upon the facts presented by affidavit, as well as other facts
of which it took judicial notice, the Rio Grande is not a navi-
gable stream within the territory of New Mexico, and that the
bill does not state a case entitling it to the relief prayed; and,
upon the complainant's declining to amend its bill further,
the court dissolved the injunction and dismissed the bill. From
that judgment the United States appealed to this court.

The right of the United States to prevent the construc-
tion of the irrigation works in question is sought to be deduced
chiefly from two acts of congress, viz.: (1)
Act September 19, 1890, sec. 10, which pro-
hibits "the creation of any obstruction, not
affirmatively authorized by law, to the naviga-
ble capacity of any waters, in respect to which
the United States has jurisdiction." (2) Act
July 13, 1892, sec. 3, which declares that it shall not be lawful
"to build any  *  *  *  dam, weir  *  *  *  or structure
of any kind  *  *  *  in any navigable waters of the United
States  *  *  *  without the permission of the secretary of
war, in any port, roadstead, haven, harbor, navigable river, or

NAVIGABLE
streams: obstruc-
tion: acts of Con-
gress, Sept. 19,
1890, and July 13,
1892, construed.

other waters of the United States, in such manner as shall obstruct or impair navigation, commerce or anchorage of said water." Some allusion has been made to the treaty of Guadalupe Hidalgo of 1848, between the United States and Mexico, as containing stipulations which would be violated by permitting the contemplated construction to proceed. The only provision of that treaty bearing upon this subject simply provides, in article 7, that the part of the Rio Grande lying below the southern boundary of New Mexico is divided in the middle between the two republics, and that the navigation below said boundary "shall be free and common to the vessels and citizens of both countries, and neither shall, without the consent of the other, construct any work that may impede or interrupt, in whole or in part, the exercise of this right." Manifestly, this applied only to that portion of the river below the boundary of New Mexico, for the same article contains the further qualifying clause that "the stipulations contained in the present article shall not impair the territorial rights of either republic within its established limits." Furthermore, the treaty of 1853, known as the "Gadsden Treaty," contains an express provision that the stipulations and restrictions of the seventh article of the treaty of Guadaloupe Hidalgo shall remain in force only so far as regards the Rio Grande "below the intersection of the 31 degree, 57 min., 30 sec., parallel of latitude with the boundary line established by that treaty." There is no undertaking by either of the parties to these treaties that the Rio Grande is, or shall continue to be, navigable. All that either agreed to in this connection was that it would not construct below the point of intersection of the above-mentioned parallel of latitude, which is about that of El Paso, any work which would interfere with the common use of the river. No obligation devolved upon the United States to conserve the waters of the river above that point for the purpose of facilitating navigation below it.

We think the whole question turns upon the applicability of the acts of congress above mentioned. By their express terms these acts deal only with navigable waters. Unless the

Rio Grande is a navigable stream, and its "navigation," or "navigable capacity," will be obstructed by the proposed dam, these statutes do not apply to the case, and can not be invoked to enable the government to stop the progress of the work by injunction.   It is alleged in the original bill that the Rio Grande, from and including the site of the proposed dam, has been used to float logs for commercial and business purposes, and for affording a means for commercial traffic within and between the territory of New Mexico and the state of Texas and the republic of Mexico.   In the amended bill it is alleged that the said river is susceptible of navigation for commercial purposes up to La Joya, in the territory of New Mexico, about one hundred miles above Elephant Butte.   In both the river is alleged to be navigable at certain points below El Paso.   It is conceded that the navigability of waters is a matter of which courts take judicial notice.   The record contains a large mass of information, in the form of maps, reports of exploring and surveying expeditions made under the direction of the war and interior departments, and also reports of officers specially detailed to investigate the feasibility of rendering the river commercially navigable by improvements, and also its capability of supplying reservoirs for irrigation.   From these and other data the following facts, as stated in the opinion of the court below, are well established:

The course of the Rio Grande in New Mexico is through rocky canons and sandy valleys.   In the valley it spreads out, shallow and between low banks, over fine, light, sandy soil, of great depth.   Bars are continually forming, passing away, and reforming, and the quicksands in the bed of the stream and along its margin are perilous to life.   The fall is from four to fifty-two feet to the mile, and the changes in its course are rapid, continual, and often radical.   The valley is scarred with low ravines made by its progress in different places.   In all the period of time only two instances were shown when the river was actually utilized for the conveyance of merchandise, and these were of timbers.   One of these instances occurred in 1858 or 1859, when a raft was sent down from Canutillo to

El Paso, a distance of twelve miles; and the other recently, when some telegraph poles were floated from La Joya a "short distance." "The water of the stream, especially in central and southern New Mexico, is heavily loaded with silt. The channel of the river through these valleys is usually choked with sand, and in times of low water the stream divided into a number of minor channels, and apparently a large percentage of the water is lost in these great deposits of fine material." 12 Ann. Rep. Geol. Sur. 204. "From Bernalillo, N. M., to Ft. Hancock, Tex., the Rio Grande is in the highest degree spasmodic, with immense floods during a few weeks of the year, and a small stream during the remainder of it." 10 Ann. Rep. Geol. Sur., p. 99. "From personal observation, I know that these seasons of flood and drouth (in the Rio Grande) were of about the same character thirty years ago." Maj. Anson Mills, 10 U. S. Cav. Rep. Spec. Com. Sen., volumes 3, 4, p. 39. But, what is of more importance, we have reports of officials upon the exploration of the river, made under the direction of the government, for the special purpose of considering its navigability. From these it appears: "The stream is not now navigable, and it can not be made so by open channel improvement. An accurate survey and hydrometric observations would be necessary to determine positively whether an improvement by locks and dams could be made or not, but the heavy fall of the river, the lowness of its banks, and the small discharge do not encourage the belief that such improvement would be financially, even if physically, practicable. Certainly there is no public interest which would justify the expenditure of the many millions of dollars which such an improvement would involve. The irrigation of the valley is a matter in which the inhabitants are now deeply interested, while the possible navigation of the river receives little or no attention from them. * * * In my judgment, the stream is not worthy of improvement by the general government." Report of O. H. Ernst, Major of Engineers, to Secretary of War, 1889. Again: "I consider the construction, not only of an open river channel, but of any navigable channel, to be

impracticable.   *   *   *   During the greatest part of the year, when the river is low, the discharge would be insufficient to supply any navigable channel, except, perhaps, a narrow canal with locks, the construction of which, on a foundation of sand, in places forty feet deep, would be financially, if not physically, impracticable." Report of Gerald Bagnall, Assistant Engineer, to Secretary of War, 1889.

The navigability of a river does not depend upon its susceptibility of being so improved by high engineering skill and the expenditure of vast sums of money, but upon its natural present conditions. In The Daniel Ball, 10 Wall. 557, the supreme court says:   "Those rivers must be regarded as public navigable rivers in law which are navigable in fact, and they are navigable in fact when they are used or are susceptible of being used, in the ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." In The Montello, 20 Wall. 431, the court says:   "If it be capable in its natural state of being used for purposes of commerce, no matter in what mode that commerce may be conducted, it is navigable in fact, and becomes a public river or highway.   *   *   *   The vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce."   The court approves the language of Chief Justice Shaw in Rowe v. Bridge Corp., 21 Pick. 344, who said:   "In order to give it the character of a navigable stream, it must be generally and commonly useful to some trade or agriculture."   See, also, Morrison v. Coleman, 6 South. Rep. (Ala.) 374.   Of course, it need not be perennially navigable, but the seasons of navigability must occur regularly, and be of sufficient duration and character to subserve a useful public purpose for commercial intercourse. While the capacity of a stream for floating logs, or even thin boards, may be considered, yet the essential quality is that the capacity should be such as to subserve a useful public purpose. Ang. Water Courses, 335.   In a recent case the supreme court of Oregon says (Haines v. Hall, 20 Pac. Rep. 835), per

Thayer, C. J.: "Whether the creek in question is navigable
or not for the purposes for which appellant used it depends
upon its capacity in a natural state to float logs and timber, and
whether its use for that purpose will be an advantage to the
public.   If its location is such, and its length and capacity so
limited, that it will only accommodate but few persons, it
can not be considered a navigable stream for any purpose.   It
must be so situated, and have such length and capacity, as will
enable it to accommodate the public generally as a means of
transportation."   And in the same case, Lord, J., said:   "It
must be susceptible of beneficial use to the public," be "capa-
ble of such floatage as is of practical utility and benefit to the
public as a highway."   And of the stream then in question he
says:   "It is not only not adapted to public use, but the public
have made no attempt to use it for any purpose."   Haines v.
Hall (Oregon), 3 L. R. A. 609.   The supreme court of Ala-
bama says:   "In determining the character of a stream, in-
quiry should be made as to the following points:   Whether it
be fitted for valuable floatage; whether the public or only a
few individuals are interested in transportation; whether any
great public interests are involved in the use of it for trans-
portation; whether the periods of its capacity for floatage are
sufficiently long to make it susceptible of use, beneficially to
the public."   Rhodes v. Otis, 3 Ala. 578; Peters v. Railroad
Co., 56 Ala. 528.   Indeed, in the letter of inquiry by the
Honorable Richard Olney, secretary of state, in respect to the
facts as to the navigability of the Rio Grande, in interstate
commerce, among other essential qualities, he says: "It should
be remembered that a mere capacity to float a log or a boat will
not alone make a river navigable.   The question is whether
the river can be used profitably for merchandise.   I have been
informed that wood is sometimes brought down the river to
Cindad Juarez, in flatboats, and that logs are rafted or floated
down from the timbered lands on the upper river, for commer-
cial purposes."   Letter January 4, 1897.   The secretary of
state seems to have been misinformed as to such use for com-
merce.   This letter was addressed to Col. Anson Mills, at

whose request it appears that applications for right of way for irrigation by the use of waters of the Rio Grande, and all its tributaries, were suspended throughout New Mexico and Colorado. The answer of Col. Mills deals almost wholly with the river internationally. The river in its relation to interstate commerce is dismissed by him with the instance of the floating of a raft of logs, in 1859, from a point eighteen miles above El Paso, and the qualifying remark, "It would now hardly be practicable to do so." Letter January 7, 1897.

It is perfectly clear that the Rio Grande above El Paso has never been used as a navigable stream for commercial intercourse in any manner whatever, and that it is not now capable of being so used. On the other hand, it has been, from the earliest times of which we have any knowledge, used as a source of water for irrigation. Its valley has always been the center of population in New Mexico. It was the first portion of this region to be occupied and settled by civilized men, and the population of this valley has always been, and is now, absolutely dependent for means of livelihood and subsistence upon the use of the waters of this river for irrigation of their fields and crops. Dams have been erected and maintained at El Paso for nearly 200 years, by which the river has been obstructed, and its waters diverted for irrigation to both sides of the Rio Grande. But never until the present time, so far as we can ascertain, has any question been raised by any one as to interference with any use of the river for purposes of navigation. Indeed, it appears from the affidavits and reports presented in support of the bill in this case that the objection now raised to the construction of the defendant's dam grows out of the proposed construction of an international dam and reservoir at El Paso, to be constructed under the auspices of the two governments. The investigation of the feasibility of such an international dam and reservoir is being made on behalf of the United States under the authority of congress, thus evincing the deliberate intention of the government, by its political department, to take measures, not for the purpose of improving the navigability of this river, but of permanently obstructing it

at a point far below the site of defendant's works, and thus to devote the stream to irrigation instead of navigation. One of the affidavits in support of the bill is made by the commissioner of the United States engaged upon this investigation, the object of which he states to be "the study of a feasible project for the equitable distribution of the waters of the Rio Grande to all persons residing on its banks or tributaries, having equitable interests therein." And he also states in one of his reports that "the probable flow of water in the river here (El Paso) is likely to be ample for the supply of the proposed international reservoir, * * * but that the flow will not be sufficient to supply the proposed international reservoir here and allow for the supply for the proposed reservoir of the Rio Grande Irrigation Company, at Elephant Butte, in New Mexico, or any other similar reservoirs in New Mexico, and but one of these schemes can be successfully carried out." That is to say, in order to render feasible the storage of water for irrigation at El Paso, it is essential to prohibit all similar structures along the river at points above.

From these extracts it seems clearly apparent that the work at El Paso to which the United States has committed itsself, tentatively at least, is not designed to preserve or improve the navigable capacity of the river, but to facilitate the distribution of the waters which may be gathered by obstructing the stream for the benefit of riparian occupants, and that the object of this proceeding is not to secure a public benefit from the navigation of the Rio Grande, but rather, under the guise of a question of navigability of the stream, to obtain an adjudication of the interests of rival irrigation schemes, in aid of one locality against another. Manifestly, neither the acts of congress cited nor the provisions of the treaty, have any application to questions of this kind, and they can not be invoked to settle conflicting local interests, whose determination must necessarily depend upon entirely different considerations.

The Rio Grande, as we have said, flows through a region dependent upon irrigation. It is a part of what is known as the arid region of this country, embracing, according to the

report of the director of the geological survey, about four-tenths of the entire area of the United States in which the rainfall is not sufficient for the production of crops. Here the paramount interest is not the navigation of the streams, but the cultivation of the soil by means of irrigation. Even if, by the expenditure of vast sums of money in straightening and deepening the channels, the uncertain and irregular streams of this arid region could be rendered to a limited extent navigable, no important public purpose would be subserved by it. Ample facilities for transportation, adequate to all the requirements of commerce, are furnished by the railroads, with which these comparatively insignificant streams could not compete. But, on the other hand, the use of the waters of all these streams for irrigation is a matter of the highest necessity to the people inhabiting this region, and, if such use were denied them, it would injuriously affect their business and prosperity to an extent that would be an immeasurable public calamity. These conditions have been distinctly recognized in the legislation of congress; for while it has refrained from any attempt to render streams like the Rio Grande navigable by artificial works, and has not in any way treated them as navigable waters, congress has, by the reservation or survey of reservoir sites along its valley, and the appropriation of large sums of money for the prosecution of investigations and surveys to this end, clearly indicated its purpose to treat these waters as suitable only for irrigation, and to consider such a use of them as the one of commanding importance.

The riparian rights of the United States were surrendered in 1866. R. S., sec. 2339. Prior to that time it had become established that the common-law doctrine of riparian rights was unfitted to the conditions in the far West, and new rules had grown up, under local legislation and customs, more nearly analogous to the civil law. Recognizing that the public domain could not be utilized for agricultural and mining purposes without the use of water applied by artificial means, and that vast interests had grown up under the presumed license of the federal government to the use of such waters,

congress confirmed the rights of prior appropriation of waters
by the act above mentioned, where the same "are recognized
and acknowledged by the local customs, laws and decisions
of the courts." Section 2339. The supreme court of the
United States, in passing upon this act, observes: "It is evi-
dent that congress intended, although the language used is
not happy, to recognize as valid the customary law with re-
spect to the use of the water which had grown up among the
occupants of the public lands under the peculiar necessities of
their condition." Atchison v. Peterson, 20 Wall. 507; Basey
v. Gallagher, Id. 671. And since 1870 patents for lands ex-
pressly except vested water rights. Congress has manifested
a purpose to extend the largest liberty of use of waters in the
reclamation of the arid region, under local regulative control.
Following in line with the act of 1866, the act of 1877 author-
ized the entry of desert lands in the arid region by those who
intend to reclaim them by conducting water upon them.
This act again distinctly recognized the validity of the right
of prior appropriation, and also provided that "all surplus
water over and above such actual appropriation and use to-
gether with the water of all lakes, rivers and other sources of
water supply upon the public lands and not navigable shall
remain and be held free for the appropriation and use of the
public for irrigation, mining and manufacturing purposes, sub-
ject to existing rights." This act was limited to states and
territories in the arid region. 1 Supp. Rev. St., p. 137. Colo-
rado was included in 1891. Id., pp. 941, 942. By the act
of 1888 (an appropriation bill) an investigation was directed
as to the extent to which the arid region might be redeemed
by irrigation. It provided for the selection of sites for reser-
voirs for the storage and utilization of water for irrigation, and
the prevention of overflows, and that the lands designated for
reservoirs, ditches, or canals, and all lands susceptible for irri-
gation therefrom, be reserved from sale or entry. Id., p. 698.
In 1890 the reservation from sale or entry of lands, except as
to reservoir sites, was repealed. Reservoir sites remained
segregated. Id., pp. 791, 792. In the same year it was pro-

vided that patents for lands west of the 100th meridian should reserve the right of way for ditches and canals.   Id., p. 792. In 1891 public lands were opened to private location for the right of way to the extent of the ground occupied by the water of the reservoir, canals and laterals and fifty feet on the margin.   In this act it was provided that "the privilege herein granted shall not be construed to interfere  with the control of the water for irrigation and other purposes under authority of the respective states or territories."   Id., p. 946.   On the twenty-sixth day of Febuary, 1897, congress opened the reservoir sites, reserved by the government under the act of 1891, to private location, and the local legislators were authorized to prescribe rules and regulations and fix water charges.   18 Decisions Department Interior, p. 168.

Considering the discussions in congress, the reports of committees, and the labors and reports of officials in the interior and war departments, made under congressional directions, it seems quite manifest that the purpose by the federal government to hold and further redeem the great arid region had become the recognized policy and the measure of the highest public importance and necessity.   It would seem that at first it was the design to establish and maintain an elaborate system of irrigation at public expense, but the immense cost of such an enterprise seems to have induced its abandonment, temporarily, at least, and in its stead another system has been provided by irrigation at private cost.   The system may be incomplete in many of its details, but, such as it is, reservoir sites have been located, surveyed, and established along the streams, navigable and non-navigable, under the immediate direction of government officials and by authority of congress, and the right to make private entries of others, under the supervision of the secretary of the interior, is also authorized.   Ruins of extensive irrigation systems, scattered all over New Mexico and Arizona, of a prehistoric people, show that conditions which have confronted the present age were conditions encountered in the remote past, and apparently overcome.   The

cultivation of the Rio Grande valley by acequias from the
river is mentioned by the earliest of Spanish priests and ex-
plorers, and is established by authentic historical memorials,
extending back more than two centuries.   The law of prior
appropriation existed under the Mexican republic at the time
of the acquisition of New Mexico, and one of the first acts of
this government was to declare that "the laws heretofore in
force concerning water courses   *   *   *   shall continue in
force."   Code proclaimed by Brigadier General Kearney, Sep-
tember 22, 1846.   One of the first acts of the local legislature
(1852) after the organization of the territory provided that
"all rivers and streams of water in this territory, formerly
known as public ditches or acequias, are hereby established
and declared to be public ditches or acequias."   Comp. Laws,
sec. 6.   In 1874 it was provided that "all of the inhabitants
of the territory of New Mexico, shall have the right to con-
struct either private or common acequias, and to take the water
for said acequias from wherever they can, with the distinct
understanding to pay the owner through whose land said ace-
quias have to pass, a just compensation for the land used."
Comp. Laws, sec. 17.   In 1887 an act was passed giving au-
thority to corporations to construct reservoirs and canals, and
for this purpose to take and divert the water of any stream,
lake, or spring, provided it does not interfere with prior appro-
priations.   Sess. Acts 1886-87, chap. 12.   Other acts have been
passed since upon the subject, in regard to the acquisition of
water rights.   But this legislation is not peculiar to New Mex-
ico.   Its general characteristics are common throughout the
west, where the doctrine of prior appropriation prevails.   This
was the character of local legislation which congress recog-
nized, confirmed and authorized by the various acts to which
reference has been made.   The doctrine of prior appropria-
tion has been the settled law of this territory by legislation,
custom and judicial decision.   Indeed, it is no figure of
speech to say that agriculture and mining life of the whole
country depends upon the use of the waters for irrigation, and,
if rights can be acquired in waters not navigable, none can have

greater antiquity and equity in their favor than those which have been acquired in the Rio Grande valley in New Mexico.

It is contended that, because the Rio Grande is capable of navigation to a limited extent several hundred miles below the point of the proposed dam, its construction will, by arresting the flow of water in the stream, interfere with its navigable capacity, and that it is therefore prohibited by the act of 1890. From the foregoing discussion of the legislation of congress, and the conditions prevailing in the region under consideration, it would seem to follow that, if there were a conflict between the interests of navigation and agriculture in relation to a stream like the Rio Grande, that of the latter would prevail. Certainly, it should be held to be under the protection of the courts against any doubtful interpretation or application of a penal statute. If the waters of the Rio Grande are not navigable in New Mexico, which we hold to be the case, then they can not be said to be waters in respect of which the United States has jurisdiction. And certainly, in the absence of some express declaration to that effect, it can not be supposed that congress intended to strike down and destroy the most important resource of this vast region, in order to promote the insignificant and questionable benefit of the navigation of the Rio Grande for a short distance above its mouth; for the construction contended for does not limit the prohibition of the act of congress to the works proposed by the defendant. It applies to the maintenance, as well as the original creation, of obstructions. If defendant's dam at a point where the river is not navigable, is an obstruction to the navigable capacity of the river several hundred miles below, the same must be said of every dam and irrigation ditch which diverts water from the river or any of its confluents to their primary sources. If, upon this ground it is competent for the United States to prohibit the erection of defendant's dam, it is equally competent for it to compel the removal of every dam and headgate heretofore constructed in the Rio Grande and its tributaries, and prohibit the use of their waters for irrigation

throughout this entire valley. It is true that courts must administer the law as they find it, and, if it is clear and free from doubt, the consequences, however disastrous, can not be considered as affording grounds for non-enforcement. But in a case like this, where it is sought by intendment, to give to the statute a meaning not apparent on its face, it is the duty of the courts to give full weight to these considerations in determining what was the intention of congress; and in view of the condition and history of the region which would be affected, the unimportance of the Rio Grande as a water way for commercial intercourse at any point, its non-navigability at the place of the proposed construction and for hundreds of miles below, and the evident purpose of congress, by its legislation, to promote irrigation throughout this portion of the country, even to the extent of further obstruction of this very stream. It would, in our opinion, be unreasonable to hold that legislation, which has a definite and well understood purpose, in furtherance of the public interest in those portions of the country to whose conditions it is applicable, was intended to operate to the detriment of the public interests in regions to whose conditions it is not applicable, and where its enforcement would be destructive of the very interests which the legislation of congress has otherwise undertaken to promote.

We, therefore, hold that the work sought to be enjoined in this action is not in violation of any law of the United States, or any treaty, and that the judgment of the district court dissolving the injunction and dismissing the bill should be affirmed; and it is so ordered.

Hamilton and Laughlin, JJ., concur in the conclusion reached.