**WISCONSIN PUBLIC SERVICE CORPORATION et al. v. FEDERAL POWER COMMISSION.**

Nos. 8427–8463.

Circuit Court of Appeals, Seventh Circuit.

Feb. 26, 1945.

744

Bert Vandervelde, of Milwaukee, Wis., Fred W. Genrich, of Wausau, Wisconsin, and John E. Martin, H. T. Ferguson, and Adolph Kanneberg, Asst. Attys. Gen., of Wisconsin (Miller, Mack & Fairchild, of Milwaukee, Wis., of counsel), for petitioners.

Charles V. Shannon, Gen. Counsel, Howard E. Wahrenbrock, Asst. General Counsel, and Willard W. Gatchell and Louis W. McKernan, Principal Attys., Federal Power Commission, all of Washington, D. C., for respondent.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

Petitioners, under § 313(b) of the Federal Power Act, 16 U.S.C.A. § 825$l$(b), seek to set aside an order of the Federal Power Commission, requiring Wisconsin Public Service Corporation[1] to apply for a license to maintain and operate a hydroelectric project on the Wisconsin River at Tomahawk in the State of Wisconsin.

The record discloses that the construction of a rock-filled timber crib dam to aid in log driving and booming as well as for the development of power for industrial use, was commenced on the Wisconsin River pursuant to a license granted on February 26, 1887, by the Legislature of the State of Wisconsin. Chap. 12, Laws of 1887. The dam, located on the upper reaches of the Wisconsin River, was constructed over a period of ten years, but it was in existence in 1889. The State made an investigation of the dam in 1933, found it in bad condition and dangerous, and ordered the dam repaired. Subsequently, Corporation procured authority from the State to reconstruct the dam and to construct a hydroelectric plant and substation in connection therewith.

The Wisconsin River has its source in Lac Vieux Desert, which lies partly in the State of Michigan and partly in the State of Wisconsin. It is 428 miles in length. It drops from an elevation of 1,652 feet at its source to 604 feet at its mouth, with an average fall of 2.45 feet per mile. It flows generally south to the city of Portage, Wisconsin, and then west for about 116 miles to its junction with the Mississippi River near Prairie du Chien.

On May 27, 1937, under § 23 of the Federal Power Act, as amended, 49 Stat. 846, 16 U.S.C.A. § 817, the Corporation filed with the Commission a declaration of intention in which it declared its intention to reconstruct the dam for the purpose of developing hydraulic power. Hearings were held and testimony was heard in October, 1937, and in February, 1938. On March 22, 1938, the State was granted permission to intervene, and thereafter additional hearings were held. On July 30, 1943, after a consideration and appraisal of the evidence, the Commission issued an order reciting that the Wisconsin River has been extensively used for the transportation of persons and property throughout its entire length; that such use has included log driving, rafting of lumber, canoe and boat navigation and steamboating; that the rafting and logging operations on the river continued for over half a century; that the Wisconsin River is a navigable water of the United States from its source in Lac Vieux Desert to its junction with the Mississippi River; that the Corporation owns a dam, power house, and other project works located across, in and along the Wisconsin River just below the city of Tomahawk, which it proposed to reconstruct; and that the interests of interstate commerce would be affected by the reconstruction proposed in the declaration of intention. The Corporation and the State filed applications for rehearing. The Commission denied the Corporation's application and dismissed the State's application.

Prior to the entry of the order, the Commission rendered an opinion in which it made detailed subsidiary findings and in which it found that because of the "regular use of the Wisconsin River over a long period of years for the transportation of large quantities of logs, lumber, rafts, and other forest products to mill and market to points within the State of Wisconsin and

[1] Hereinafter the parties will be referred to as follows: Wisconsin Public Service Corporation as Corporation. The State of Wisconsin and the Public Service Commission of Wisconsin collectively as State. The Federal Power Commission as Commission.

in other States * * * the Wisconsin River is navigable throughout its entire length."

The principal question is whether the Wisconsin River is a navigable river of the United States.

Petitioners seek to set aside the order on the ground that the Wisconsin River, at and for many miles below Tomahawk, is not a navigable water of the United States. They make the point that diverse elements enter into the application of the legal tests of navigability, which must be appraised in totality so as to determine the effect of all, and in support of the point they cite authorities[2] to the effect that the commerce on the claimed navigable river must be substantial and of a permanent character, and that where the use of the stream is temporary, precarious or unprofitable, such use will not render a stream navigable.

State asks that the order be set aside on the grounds that the Wisconsin River lies wholly within the State of Wisconsin; that it could not be made navigable for interstate commerce from Portage to its mouth except at a cost ridiculously in excess of the benefits or profits derivable therefrom, and could not be made navigable between Portage and its source, except by the expenditure of a sum so fabulous in amount as to make the attempt unthinkable; that it is not now used for any commerce; and that the fact that logs were floated down the river during one or two short seasons in each year, which was discontinued when this method of getting forest products to market was superseded by railroad transportation, is not sufficient to establish navigability.

Corporation argues that the important concepts of navigability are contained in the phrases "in their ordinary condition," "are used or suitable for use," and "customary modes of trade and travel on water," and that a "continued highway" for the carrying on of interstate commerce is necessary to constitute a navigable water of the United States. And it is claimed that in the instant case the use of the river was temporary and precarious; that its use was limited; and that the mere fact that logs and rafts may have been floated down the stream at high water did not render it a navigable stream.

It is true that the legal concept of navigability is not to be determined by a formula which fits every type of stream under all circumstances and at all times, but prior decisions in this field will be drawn upon and applied in determining whether the particular circumstances render the stream a navigable river of the United States. United States v. Appalachian Electric Power Co., 311 U.S. 377, 404, 61 S.Ct. 291, 85 L.Ed. 243.

From Lac Vieux Desert to Grandmother Falls the river has an average slope for 105 miles of 2.25 feet per mile. From Grandmother Falls to the foot of Grandfather Falls, a distance of 6.4 miles, the river falls 115 feet, or 18 feet per mile. From the foot of Grandfather Falls to Stevens Point, a distance of 81 miles, the average slope is 2.66 feet per mile. From Stevens Point to Nekoosa, 28 miles, the river falls 163 feet, or an average of 5.55 feet per mile. From Nekoosa to the mouth of the Wisconsin River, a distance of 207 miles, the slope of the river is 1.53 feet per mile.

Before the Commission it was claimed that above Nekoosa the river has a succession of rapids, surging over rocky bottoms filled with boulders; that the river has a current of ten to twenty miles per hour; and that the channel is broken and divided, offering *almost* insurmountable obstacles to anything like navigation. But there is evidence in the record that from 1835 to 1897 some three billion board feet of white pine was taken out of the State of Wisconsin down the Wisconsin River "to market" on the Mississippi River from Dubuque, Iowa, to St. Louis, Missouri. This use of the river continued at a diminishing rate until 1915. During the period between 1858 and 1907 a large part of this lumber was logged above Tomahawk and taken down the river past the Corporation's dam. As far down as Merrill, some 28 miles below Tomahawk, the lumber was transported in loose logs driven downstream. The logs were cut into lumber at the mills at Merrill and other points on the river, and thence rafted down the Wisconsin and Mississippi Rivers

[2] United States v. Rio Grande, etc., Co., 174 U.S. 690, 19 S.Ct. 770, 43 L. Ed. 1136; Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914; North American Dredging Co. v. Mintzer, 9 Cir., 245 F. 297; United States v. Doughton, 4 Cir., 62 F.2d 936; Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771; Brewer-Elliott, etc., v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140; and Harrison v. Fite, 8 Cir., 148 F. 781.

to market in other States. The rafting from Merrill commenced about 1849, and until after the advent of the railroads, it was the only means of reaching a market.

The log driving season began with the spring freshet in April and aggregated in the neighborhood of 150,000,000 board feet. If a drive was hung up for lack of water, the crew would wait for another freshet to finish the drive, the "June freshets" being, in the language of one witness, "as regular as the sun rises and sets," and there were some drives in the Fall. The drives ended from 28 to 114 miles below Tomahawk. These freshets assured two rafting trips each year. The rafts were usually run to a fixed destination such as St. Louis, Missouri, Dubuque, Iowa, or Alton or Galena, Illinois.

As early as 1857 there were 3,000 men engaged in the lumbering industry and the log stock exceeded $4,000,000 yearly in value. Timber owners engaged in the industry sold their logs before the drive started or when the logs reached the mills. The log driving crews were usually paid off when the logs were sold at the mill, but occasionally the same crew ran the rafts down to market where they were paid off. The sawmills obtained their funds for the purchase of the logs and the payment of operating expenses through advances obtained from the river dealer, payable when the rafts came down. Thus, the industry depended, for the funds its operations required, upon the transportation of the lumber to market on the Mississippi River and its sale there.

At this point we discuss some of the cases claimed by petitioners as holding that the use of logging and rafting is not sufficient to make a river a navigable water of the United States.

North American Dredging Co. v. Mintzer, 9 Cir., 245 F. 297, 299, involved a channel which the court described as having "never been used or regarded as available for any kind of navigation, other than for duck boats or punts for hunting and fishing." In United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, as is shown by the opinion of the Supreme Court of New Mexico, 9 N.M. 292, 51 P. 674, 675, only two instances were shown when the Rio Grande River had actually been utilized "for the conveyance of merchandise," while Leovy v. United States, 177 U.S. 621, 627, 20 S.Ct. 797, 44 L.Ed. 914, involved the navigability of

Red Pass, a crevasse caused by an overflow from the Mississippi River. The only use shown as respects navigation was that small luggers or yawls sometimes went through this pass and were restricted to the river end of the crevasse. In Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771, no actual commercial use whatever of the portion of the Red River in controversy was shown, and in Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 43 S. Ct. 60, 67 L.Ed. 140, the court found that the rafting of logs had been attended with difficulties precluding utility. "There was no practical susceptibility to use as a highway of trade or travel." D.C., 249 F. 609, 623, and 8 Cir., 270 F. 100, 103. Thus it is clear these cases are not applicable here.

■■ The power of the United States over its waters which are capable of use as interstate highways arises from the commerce clause of the Constitution, Art. 1, § 8, cl. 3, and its power over improvements for navigation in rivers is absolute. To make its control effective the Congress may keep the "navigable waters of the United States" open and free and provide by sanctions against any interference with the country's water assets. It may legislate to forbid or license dams in the waters. United States v. Appalachian Power Co., supra, 311 U.S. at pages 404, 405, 61 S.Ct. at page 298, 85 L.Ed. 243.

By the Federal Water Power Act (41 Stat. 1063, and the Act was amended by Act Aug. 26, 1935, 49 Stat. 838, 16 U.S.C.A. § 791a et seq., by which it became known as the Federal Power Act), Congress created a Federal Power Commission with authority to license the construction of dams. Section 23(b) of the Act provides that any person intending to construct a dam in any stream over which Congress has jurisdiction other than those defined in the Act as navigable waters, shall before such construction file declaration of intention with the Commission, whereupon the Commission shall cause an investigation to be made, and if upon investigation it shall find that the interests of interstate commerce would be affected by such proposed construction, such person shall not construct, maintain or operate such dam or other project works until he shall have applied for and shall have received a license under the provisions of the Act. In the Act, Congress defined "navigable waters" as those parts of streams or other bodies of water "which either in their natural or im-

proved condition notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce," § 3(8), 16 U.S.C.A. § 796(8). However, long before the passage of the Federal Power Act, courts had occasion to define what were "navigable waters" of the United States.

■■■■ An early and instructive discussion of the question confronting us is to be found in The Daniel Ball, 77 U.S. 557, 563, 19 L.Ed. 999. In that case the court said: "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." The uses to which the stream may be put vary from the carriage of ocean liners to the floating of logs, United States v. Appalachian Power Co., supra, 311 U.S. 405, 61 S.Ct. 291, 85 L.Ed. 243, and there has never been doubt that the navigability referred to was navigability despite the obstruction of falls, rapids, sand bars, carries or shifting currents. United States v. Appalachian Power Co., supra, 311 U.S. 409, 61 S.Ct. 291, 85 L.Ed. 243. In The Montello, 87 U.S. 430, 441, 22 L.Ed. 391, the court said: "The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway." And it is well settled that the floating of logs, in the course of a continuous movement from one State to another, is interstate commerce, and may be a sufficient use for the purposes of commerce, Sands v. Manistee River Improvement Co., 123 U.S. 288, 8 S.Ct. 113, 31 L.Ed. 149; St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners, 168 U.S. 349, 18 S.Ct. 157, 42 L.Ed. 497; Champlain Realty Co. v. Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309, 25 A.L.R. 1195; and Hughes Bros. Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L. Ed. 359.

The Wisconsin courts have had occasion to pass upon the navigability of the Wisconsin River. In Wisconsin River Improvement Co. v. Lyons, 30 Wis. 61, 66, the court said: "It [Wisconsin River] is a stream capable of and which has long been used for floating rafts and fleets of lumber and logs, and boats loaded with the products of the country, to mill and market, and as such is a public highway."

The case of Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847, which went up from this circuit, involved the Des Plaines River. This river had been used by canoes and light draft boats from 1675 to 1825. After 1825 the clearing of the forest and the drainage of the swamp lands affected the run-off into the river, the construction of artificial canals diverted water which would otherwise have flowed into the river, and the building of a number of dams and bridges completed the artificial obstruction so' that it had not been used for navigation for a century. The court in disposing of the contention that the Des Plaines River was non-navigable in law, at page 124 of 256 U. S., at page 413 of 41 S.Ct., 65 L.Ed. 847, said: "The Desplaines river, after being of practical service as a highway of commerce for a century and a half, fell into disuse, partly through changes * * * in its own condition, partly as the result of artificial obstructions. In consequence, it has been out of use for a hundred years; but a hundred years is a brief space in the life of a nation. Improvements in the methods of water transportation or increased cost in other methods of transportation may restore the usefulness of this stream; since it is a natural interstate waterway, it is within the power of Congress to improve it at the public expense; and it is not difficult to believe that many other streams are in like condition and require only the exertion of federal control to make them again important avenues of commerce among the states. If they are to be abandoned, it is for Congress, not the courts, so to declare."

■■■ The claim is also made that since the passage of the Federal Power Act, the cases just cited are inapplicable.

The argument is that Congress was aware that many streams are "no longer useful and have no prospect of being useful as avenues of commerce" and if Congress had intended to give the Commission jurisdiction over all navigable waters, it

would not have added the phrase "are used or suitable for use."

To agree with this argument we would have to disregard United States v. Appalachian Power Co., supra. In that case the court, 311 U.S. at page 408, 61 S.Ct. at page 299, 85 L.Ed. 243, said: "When once found to be navigable, a waterway remains so," and, continuing at page 409 of 311 U.S., at page 300 of 61 S.Ct., 85 L.Ed. 243, "Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense."

■■ The ultimate finding of navigability is a factual question, United States v. Appalachian Power Co., supra, 311 U.S. at page 405, 61 S.Ct. at page 298, 85 L.Ed. 243. Section 313(b) of the Federal Power Act provides that the finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. We have frequently been told that in reviewing the ultimate findings and conclusions of an independent agency, it is not the function of the court to substitute its own inferences of fact for that of the independent agency, National Labor Relations Board v. Nevada Copper Corporation, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305, and where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. The Commission's determination that the Wisconsin River is a navigable river of the United States must be accepted if it has "warrant in the record" and a reasonable basis in law. National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851. After applying the tests enumerated in the cases cited, we believe the evidence as shown by this record, establishes a long, regular and commercially successful use of the stream for the transportation of logs and rafts, and forms a reasonable basis in law for the conclusion that the Wisconsin River was and is a navigable water of the United States.

■■ It is asserted that since the logs were carried down and sold and delivered to saw mills as far down as Wisconsin Rapids, but not beyond, the operations were purely intrastate in character. We find no merit in this contention.

The Wisconsin River constitutes a continuous highway over which commerce is or may be carried on with the States of Iowa, Illinois, and Missouri. The Daniel Ball, supra; United States v. Appalachian Power Co., supra; Economy Light & Power Co. v. United States, supra; and Pennsylvania Water & Power Co. v. Federal Power Commission, 74 App.D.C. 351, 123 F.2d 155. Interstate commerce as contemplated by the Constitution "is not a technical legal conception, but a practical one, drawn from the course of business," Minnesota v. Blasius, 290 U.S. 1, 7, 54 S.Ct. 34, 36, 78 L.Ed. 131, and is determined by what is actually done, Western Oil Refining Co. v. Lipscomb, 244 U.S. 346, 37 S.Ct. 623, 61 L.Ed. 1181.

We have already observed that three billion board feet of white pine was taken out of the State of Wisconsin down the Wisconsin River "to market" on the Mississippi River from Dubuque, Iowa, to St. Louis, Missouri, a large part of which was logged above Tomahawk and taken to Merrill where it was cut into lumber and thence rafted down the Wisconsin and Mississippi Rivers "to market" in other States. The sawing of the logs into lumber at the mills and the change in the mode of transportation did not divide the journey from "the Pineries" to "market" into two distinct, unrelated journeys, the first of which is purely intrastate and the other interstate, Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518; Stafford v. Wallace, 258 U.S. 495, 516–519, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; and Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 474, 47 S.Ct. 170, 71 L.Ed. 359.

■■ Corporation makes the point that since authority to construct and maintain the dam had been granted by the State of Wisconsin, it constituted a permit for the reconstruction of the dam, and the Commission was without power to require the Corporation to take out a license under the Federal Power Act.

In support of its contention, Corporation argues that the dam completed in 1889 was a lawful structure, when constructed, and so continued when the Federal Power Act was enacted, and that the rights acquired by those who had constructed dams in navigable waters under authority from a State prior to June 10, 1920, were not subject to the Act. The argument is based upon § 23 (a) of the Act, as amended, 16 U.S.C.A. § 816, which provides: "The provisions of this Part shall not be construed as affecting any permit * * * heretofore grant-

ed * * * or * * * any authority heretofore given pursuant to law * * *," and upon § 27, 16 U.S.C.A. § 821, which provides: "That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." But § 23(b) of the Act provides: "It shall be unlawful for any person, State, or municipality, * * * to construct, operate, or maintain any dam * * * in any of the navigable waters of the United States * * * except under and in accordance with the terms of a permit * * * granted prior to June 10, 1920, or a license granted pursuant to this Act."

The contention that the Act does not apply to dams constructed before the passage of the Federal Power Act was considered in Pennsylvania Water & Power Co. v. Federal Power Commission, 74 App. D.C. 351, 123 F.2d 155, certiorari denied, 315 U.S. 806, 62 S.Ct. 640, 86 L.Ed. 1205. In that case, in disposing of the contention the court, 123 F.2d at page 163, said: "To sustain petitioner's position in this respect would be to disregard the plain language of the Act. Section 23 makes it unlawful 'to construct, operate, or maintain * * *.' a dam in a navigable water of the United States without a license. Petitioner is maintaining its dam contrary to this provision. It cannot be considered, we think, that Congress meant to allow existing obstructions to continue unregulated in the navigable streams of the United States."

Another case in which a similar contention was made is Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 137 F.2d 787, certiorari denied, 320 U.S. 815, 64 S.Ct. 206. In that case the company also sought to set aside an order of the Commission. It, too, contended that at the time it applied for its license, it had a permit which had been issued by the State of New York. The court rejected the contention and held that no prescription could run against the United States, and that the State's license, being beyond its powers, did not give the company any right to seize upon the energy of the nation's streams, or to impair their navigability.

The order of the Commission will be affirmed. It is so ordered.