**STATE OF WISCONSIN et al.**
v.
**FEDERAL POWER COMMISSION.**
No. 10948.

United States Court of Appeals
Seventh Circuit.
July 2, 1954.

Harold H. Persons, Asst. Atty. Gen., of Wisconsin, William E. Torkelson, Chief Counsel, Public Service Commission of Wisconsin, Madison, Wis., of counsel, Vernon W. Thomson, Atty. Gen., Roy G. Tulane, Asst. Atty. Gen., for petitioners.

Willard W. Gatchell, Gen. Counsel, John C. Mason, Trial Atty., Louis C. Kaplan, Washington, D. C., for respondent.

Before DUFFY, LINDLEY and SCHNACKENBERG, Circuit Judges.

DUFFY, Circuit Judge.

This is a petition to review an order of the Federal Power Commission (hereinafter called Commission) issued April 21, 1953, amending a license for Project No. 2064 previously issued to Winter Electric Light and Power Company. The project is located at Snap Tail Rapids on the East Fork of the Chippewa River in Sawyer County, Wisconsin.

The jurisdictional basis for the original license for Project No. 2064 was that the project would occupy lands of the United States within the Chequamegon National Forest. In the license as issued there was a proviso that nothing therein should be construed as determining whether the East Fork of the Chippewa River is a navigable water of the United States at the project site or whether the interests of interstate commerce would be affected by the project if constructed.

In the application for an amendment, the licensee requested a finding by the Commission under § 4(e), 16 U.S.C.A. § 797, of the Federal Power Act, 16 U.S.C.A. § 791a et seq., respecting the navigability of the East Fork of the Chippewa River and the effect of the project on the interests of interstate or foreign commerce.

In the order here under review the Commission found that the East Fork of the Chippewa River from points at its headwaters upstream from the project site down to its mouth constitutes navigable water of the United States, and that the construction and operation of the project will affect the interests of interstate or foreign commerce. However, the State of Wisconsin and the Public Service Commission of Wisconsin contend that the East Fork of the Chippewa River is not navigable water of the United States, and they have petitioned for a review of the Commission's order.

The East Fork of the Chippewa River originates in the southeasterly part of Ashland County, Wisconsin, and flows in a southwesterly direction through Ashland and Sawyer Counties to its confluence with the West Fork of the Chippewa River, to form the Chippewa, which continues in a south-southwesterly direction until it empties at the south end of Lake Pepin, on the Wisconsin-Minnesota boundary, into the Mississippi River. The East Fork of the river has a number of rapids. At other places the river widens out and some of those wide areas are designated as lakes. Snap Tail Rapids is located betwen Blaisdell Lake and Hunter Lake and is the site of the dam constructed by the Winter Electric Light and Power Company under Project No. 2064. The river water flows rapidly in Snap Tail Rapids and a number of rocks protrude above the water level, making the passage of any kind of boat very difficult. Since the construction of the dam most of the water in the river is diverted into an open canal, which extends for about 9/10 of a mile to the powerhouse, and the water is then returned to the river about one-half mile down stream from the dam by means of a tail race. The Department of the Army has never exercised active jurisdiction of the Chippewa River above Eau Claire, Wisconsin, which is many miles south of Snap Tail Rapids.

The East Branch of the Chippewa River never was utilized for ordinary boat traffic. The claim that it is navigable water under the federal test is based upon its use in log drives from 1876 to 1924, during that period when Wisconsin was denuded of its great pine forests. In the early days of the period, when railroad transportation was not available or convenient, a number of rivers in northern Wisconsin were utilized to move pine logs from the forests to the saw mills. Even in the latter part of that period, and as long as the logs were available, some of the rivers were utilized for such purpose, apparently for economic reasons.

Log drives on the East Branch of the Chippewa occurred annually during the spring and early summer of each year from 1876 to 1924. The practice was for lumber camps to be established at various points in the forest. In some old-time camps, the crews comprised as many as 100 men who, during the winter season, would cut as much as 20,000 feet of logs per day. These logs would then be dragged or otherwise transported to or near the edge of the river, waiting for high water resulting from the spring runoff. Some of the log driving operations were extensive, the record showing that one operator in 1895 cut and drove down river over 40,000,000 feet of pine from four camps. The record also shows that a single unit of a log drive would take from a week to ten days to pass a given point on the East Fork of the Chippewa. Many of the logs were driven to points outside of Wisconsin, such as Winona, Minnesota, and Dubuque, Iowa.

Special boats were used in connection with the log drives and were known as batteaux and wanigans. The batteaux were personnel carriers. A small type was 16 ft. long, but those most commonly used were about 30 ft. long and 4½ to 5 ft. wide, with a 10″ draft when loaded, and capable of carrying 18 men. The wanigans were large flat boats, 30 to 35 ft. long, formed of huge logs, sloped up at the ends, having one oar at the front end and one behind for guiding purposes. There were two types of wanigans, one known as a cook wanigan, to carry a shanty or tent, the cooks and the fireplace, and the other a blanket wanigan, for carrying blankets and other sleeping gear of the men engaged in the drive. Because of the rapid, shallow water at Snap Tail Rapids, together with the large boulders and stones in the river bed, it was customary to unload the wanigans and portage supplies around the rapids. Whether the wanigans were proceeding upstream carrying supplies for the logging camps or downstream accompanying the log drives, it was necessary to propel the wanigans through the rapids by the use of ropes and anchors. Many times, batteaux were brought through Snap Tail Rapids in the same manner. However, since 1924, when the log drives ended, there had been no boat traffic through the rapids, except canoes or an occasional small fishing boat.

During the period of the log drives, dams such as those located at Bass Lake and Fish Trap Creek would be closed during the night and opened during the day. A preponderance of the evidence discloses that this was done for the purpose of flushing the logs down the river. However, there was testimony which the Commission was entitled to believe, to the effect that the dams were opened and closed for the most part to regulate the flow so that excessive water would not cause the moving logs to be scattered along the banks of the river, thus requiring man power to return them to the river water.

Since Wisconsin's admission to the Union, its courts have applied the saw-log test of navigability. Muench v. Public Service Comm., 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40. Under the Wisconsin rule any stream in that State capable of floating a saw log during spring or other freshets is navigable. However, we must here determine whether the East Fork of the Chippewa is navigable under the federal rule, for a holding under State law is not deter-

minative of navigability under federal law. Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 87, 43 S.Ct. 60, 67 L.Ed. 140.

The federal statutory definition of navigable waters is found in § 3(8) of the Federal Power Act, 16 U.S.C.A., § 791a et seq. Congress has classified navigable waters as being "parts of streams * * * which either in their natural or improved condition notwithstanding interruptions between the navigable parts * * * by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, * *."

The decision of the Commission was based upon the premise that movement of loose logs and traffic by batteaux and wanigans constitute recognized methods of navigation and that the commerce resulting therefrom is commerce of a type contemplated in the commerce clause of the Constitution when shown to have interstate characteristics. The Commission considered that the logging operations from 1876 to 1924 constituted a business of large proportions, and that the log drives during that period were conducted regularly during the annual logging season.

The Commission relies on our opinion in Wisconsin Public Service Corp. v. Federal Power Comm. (The Tomahawk Case), 7 Cir., 147 F.2d 743, certiorari denied 325 U.S. 880, 65 S.Ct. 1574, 89 L.Ed. 1996. In that case the principal commerce involved was logging, and dams were utilized to aid the drives. We there said, 147 F.2d at page 747: "And it is well settled that the floating of logs, in the course of a continuous movement from one State to another, is interstate commerce, and may be a sufficient use for the purposes of commerce". (Citing) We also said, 147 F.2d at page 748: "After applying the tests enumerated in the cases cited, we believe the evidence as shown by this record, establishes a long, regular and commercially successful use of the stream for the transportation of logs and rafts, and forms a reasonable basis in law for the conclusion that the Wisconsin River was and is a navigable water of the United States."

In St. Anthony Falls Water-Power Company v. St. Paul Water Commissioners, 168 U.S. 349, 18 S.Ct. 157, 42 L.Ed. 497, it was held that the upper reaches of the Mississippi River were navigable at all points, although it had been established that only logs were able to traverse certain sectors of the river. The court said, 168 U.S. at page 359, 18 S.Ct. at page 161: "Preliminarily, it may be said that the Mississippi river at the point in question is a navigable stream. In order to be navigable, it is not necessary that it should be deep enough to admit the passage of boats at all portions of the stream. * * * It was navigable above the rapids for the purpose of running shallow boats and for floating logs." Hence the situation was similar to the proof in the case at bar, which established that the river both above and below Snap Tail Rapids had been used for the transportation of logs and the running of shallow boats. Both sides cite United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243. It is noteworthy that the court there said, 311 U.S. at page 405, 61 S.Ct. at page 298: "It is obvious that the uses to which the streams may be put vary from the carriage of ocean liners to the floating out of logs; * * *."

The fact that the East Branch of the Chippewa River has not been used for the transportation of logs since 1924 is, according to the authorities, of little moment. In Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S. Ct. 409, 65 L.Ed. 847, it appeared that the Desplaines River in Illinois had been used by canoes and light draft boats from 1675 to 1825. For 100 years thereafter it had not been used for navigation. The Supreme Court stated, 256 U.S. at page 124, 41 S.Ct. at page 413: "The Desplaines river, after being of practical service as a highway of commerce for a century and a half, fell into disuse, part-

ly through * * * changes in its own condition, partly as the result of artificial obstructions. In consequence, it has been out of use for a hundred years; but a hundred years is a brief space in the life of a nation; * * *."

We think the Commission under the authorities cited is correct in holding that the East Branch of the Chippewa River is navigable. It should be noted, however, that any issue as to the recreational value of the river is not before us. This question was determined by the Commission prior to the issuance of the original license. Order

Affirmed.